DITMARS-31' STREET DEVELOPMENT CORP., Plaintiff, *v.* CHARLES PUNIA et al., as Copartners Doing Business as LIMAX COMPANY, et al., Defendants.

Second Department, December 3, 1962.

*Ira M. Belfer* (*Martha Prince* of counsel), for plaintiff.

*Dreyer & Traub* (*Sylvan D. Freeman* of counsel), for defendants.

SAMUEL RABIN, J. The agreed statement of facts submitted on this controversy (Civ. Prac. Act, §§ 546–548) presents, as between purchaser and seller, an issue of law as to the construction of a written contract between them for the sale of real property. The amount of the purchase price required to be paid by the purchaser on the title closing and the consequent ownership of the escrow fund in suit depend upon the determination of such issue.

The facts, as set forth in the submission, are substantially as follows:

On January 26, 1960, defendants Punia and Marx, copartners doing business as Limax Company, as the seller, entered into a written contract with plaintiff's assignor, Jacsline Realty Corp., as the purchaser, for the sale of certain income-producing property in the Astoria section of Queens County. The purchase price was stipulated to be $979,810.25, payable $25,000 on contract; $225,000 on delivery of the deed; $383,060.33 and $346,-749.92 by the purchaser taking title subject to interest-bearing first and second mortgages which, on the contract date, had been reduced to these amounts. Copies of the two mortgage instruments were "exhibited to the attorney for the purchaser and initialed by him". The first mortgage provided for quarterly

amortization payments and the second mortgage provided for monthly amortization payments in reduction of the principal. The closing date was fixed in the contract for April 26, 1960.

With respect to the effect of interim amortization mortgage payments by the seller, the contract contained this provision (hereafter referred to as the "amortization clause"): "The purchase price herein shall be reduced by the amount of any amortization payments required to be made and made by the seller on either the first or second mortgage or both between the date hereof and the date fixed herein for closing of title."

The contract further provided that the following items shall be "apportioned," namely, rents, interest on mortgages, insurance premiums, taxes, sewer rents, water charges and fuel.

The contract also contained the following provision for deferring the closing (hereafter referred to as the "adjournment clause"): "In the event that the purchaser shall request an adjournment of the closing of title for a period not exceeding sixty (60) days, it shall pay the additional sum of $25,000.00 on account of the balance of the purchase price, and the same provisions shall apply as above stated."

The contract fixed the closing date as April 26, 1960, but the parties did not close title on that date; and the transaction remained inchoate until June 20, 1960. On that date, by letter, the purchaser's attorney tendered $25,000 as an additional deposit to be applied toward the purchase price, upon the expressed understanding that the closing was to be adjourned to August 26, 1960. The seller agreed thereto in writing. Thereafter, by mutual consent indorsed on three similar letters, the title closing was further adjourned to October 26, 1960, to December 2, 1960, and to January 6, 1961. With each of these three letters the purchaser paid an additional $25,000 deposit to be applied toward the purchase price.

The last of such adjournment letters or agreements, in language similar to that used in the earlier ones, contained the provision (hereafter referred to as the "adjustment clause"): "that all adjustments in accordance with the terms of the contract shall be as of the date of consummation of the transaction."

Between the original closing date of April 26, 1960 and the last adjourned date of January 6, 1961, on which the closing was finally consummated, the seller, pursuant to the terms of the first and second mortgages, made amortization payments thereon totaling $13,810.98.

At the closing on January 6, 1961, the plaintiff, as the purchaser's assignee, demanded that these amortization payments of $13,810.98 be credited to it in further reduction of the pur-

chase price of $979,810.25 by virtue of the amortization clause quoted. The seller, however, took the position that under the contract the plaintiff was entitled to have the purchase price reduced only by the amount of the seller's amortization payments made between January 26, 1960, the date of the contract, and April 26, 1960, the date originally set for the closing, without regard to such payments between the latter date and January 6, 1961, the final adjourned date on which the transaction was consummated.

In order that title might close despite their differences of opinion, the parties agreed that the plaintiff should deposit in escrow with Dreyer and Traub, Esqs., attorneys for the seller, the sum of $13,810.98, under a stipulation providing for the present submission of their controversy to this court. Such attorneys are now parties defendant to this submission; as escrowees they are subject to the jurisdiction of this court and will be required to disburse the escrow funds to such party as this court shall determine to be legally entitled thereto.

The precise question to be determined by us under this submission has been defined by the parties as follows: "The controversy herein submitted for decision is whether or not upon the foregoing facts, plaintiff is entitled to have the purchase price of the property reduced by the sum of $13,810.98, the amount of the amortization payments made by Limax Company [the seller] on the first and second mortgages between April 26, 1960 and January 6, 1961, or whether Limax Company [the seller] is entitled to judgment in the amount of $13,810.98, said sum being the amortization payments made by * * * [it] from April 26, 1960 to January 6, 1961."

The interrelation of mortgage payments and an adjournment past April 26, 1960 is not specifically referred to in any of the series of four letter-agreements under which adjournment was four times carried forward to January 6, 1961 by the well-seasoned and capable counsel for both parties. Of course, on the submission of a controversy, parol evidence as to the intention of the parties may not be considered. Neither may we draw evidentiary inferences from the agreed statement of facts; nor may we consider a statement of fact appearing only in the brief of a party, even if such statement be not disputed. On a statutory submission our function is confined to stating the legal conclusions flowing from the uncontroverted facts in the submission. (*Employers Mut. Liab. Ins. Co. of Wisconsin* v. *Ætna Cas. & Sur. Co.*, 7 A D 2d 853, motion for leave to appeal denied 6 N Y 2d 705; *Cormeny* v. *American Bosch Arma Corp.*, 7 A D 2d 912.)

In effect, the parties on the present submission ask us merely to interpret the purport and effect of their writings. Apparently they have decided that there is no conflicting parol evidence available to them for submission to a trial court on the problem now presented to us.

It has been held that where the provisions of the writing "made out an intelligible contract" and where the facts were undisputed, there is no question of fact for the jury (*Schoen* v. *Wagner,* 1 App. Div. 298, 301). In the *Schoen* case (*supra,* p. 300) the court noted that the instrument before it seemed to be "reasonably clear in its terms and to require no explanation as to what the parties meant by their contract". Here, the contract is reasonably clear and the facts, as stated in the contract and in the submission are undisputed.

Since the contract may not be varied by parol, the scope of our inquiry in its construction has been authoritatively stated: "' it is not the real intent but the intent expressed or apparent in the writing which is sought.' (2 Williston on Contracts, § 610.)" (*Hutchison* v. *Ross,* 262 N. Y. 381, 398.) Courts do not make new contracts for the parties; nor should they give those already made a strained construction. Where the contract is in writing, "the intention of the parties must be ascertained from what they wrote" (*Lancaster at Fresh Meadow* v. *Suderov,* 6 Misc 2d 12, 14, affd. 5 A D 2d 1015). As epitomized in *Raleigh Associates* v. *Henry* (302 N. Y. 467, 473–476): "we concern ourselves with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote [p. 473] * * * In short, since the lease agreement is unambiguous, parol evidence as to what might have been in the mind of one party or the other as to the amount of the renewal rent, was neither necessary nor justified" (p. 476).

In the contract at bar, it is manifest that the parties originally had agreed that the purchase price would in effect be reduced to the extent that the seller made amortization payments "between the date hereof and the date fixed herein for closing of title." By context, "the date hereof" was January 26, 1960, the date the parties signed the contract; and "the date fixed herein for closing of title" was April 26, 1960, the date they chose for that purpose.

The plaintiff contends that insofar as the mortgage payments were concerned the parties intended to alter "April 26, 1960" into January 6, 1961, the date which they ultimately selected for the title closing. It is significant, however, that no such express provision was written into any of their four subsequent letter-agreements fixing the adjourned dates and specifying the terms

of the adjournment. Hence, the plaintiff must place its reliance on the specific language of the "adjustment clause" in such letter-agreements. Such clause requires that "all adjustments in accordance with the terms of the contract shall be as of the date of consummation of the transaction."

On that basis, however, plaintiff's position becomes untenable. The word "adjustments" in its common understanding or in its accepted meaning in the profession does not encompass the *purchase price* fixed in a contract for the sale of real property. Unless otherwise expressly so stated, "adjustments" refer to "the calculation of [the] apportionments of the various charges" affecting the subject real property (2 Rasch, Real Property Law and Practice, § 1437). The charges thus implied involve basically the "ownership-expenses, such as taxes, insurance, etc.," and the purpose of computing adjustments is to require the purchaser to reimburse the seller for outlays connected with such "incidents of ownership" from the date the purchaser acquires title (2 Rasch, Real Property Law and Practice, § 1438).

In the listing of "adjustments" in a closing statement, it is clear that the purchaser is to be charged with such outlays (2 Rasch, Real Property Law and Practice, § 1441). On the other hand, "the purchaser is to be credited with the sum he has paid on account of the purchase price" and with the "amount of any mortgages encumbering the property" (2 Rasch, Real Property Law and Practice, § 1442). In addition to the foregoing items, "the purchaser is entitled to the rents from the day of closing through the end of the period to be adjusted" (2 Rasch, Real Property Law and Practice, § 1442, p. 1057).

By the foregoing standards, absent any contrary definition in the contract, "adjustments" represent an apportionment of various charges relating to the income and expense of the subject property and have no reference to the purchase price. To hold otherwise in this case would result in "placing one party at the mercy of the other"; such a construction "is to be avoided if possible" (*Geller* v. *Tow*, 261 App. Div. 773, 776; *Price* v. *Spielman Motor Sales Co.*, 261 App. Div. 626, 629). The court is to render not "an eleemosynary" but "a business meaning to the words used in a cautiously drawn contract" (*Atwater & Co.* v. *Panama R. R. Co.*, 246 N. Y. 519, 524). Here, most relevant in determining the proper construction of the contract, is the express agreement therein that only the following items shall be apportioned, and none other: Rents, interest on mortgages, insurance premiums, taxes, sewer rents, water

charges and fuel. To infer that the purchase price, not so included in the original contract, was likewise to be apportioned as part of the " adjustment clause " mentioned in the final letter of adjournment would place the seller " at the mercy " of the purchaser — a result not warranted by justice or authority.

In addition to the foregoing, the contract contains internal and structural evidence that reduction of the purchase price was to be limited only to the amount of the amortization payments made by the seller up to April 26, 1960. As a matter of sequence, the gross sales price of $979,810.25 and the terms for its payment ($25,000 cash on signing of contract, $225,000 on deed, and $383,-060.23 and $346,749.92 by taking title subject to mortgages in such amounts) are part of the text of the main contract document. So, too, is the clause that rents, interest on mortgages, insurance premiums, taxes, water charges and fuel shall be apportioned, and the provision fixing April 26, 1960 as the closing date. Nothing is set forth in this part of the main contract document with respect to any reduction in the purchase price as a consequence of mortgage payments by the seller.

It is only in the " Rider " which was annexed to the original printed text or main body of the contract that statements are found to the effect that the purchaser undertook to deliver alteration plans together with a lease supplanting the existing Skouris lease on the subject property " within 90 days from this date [Jan. 26, 1960]," and that the new lease " shall be for a term of years not less than the present Skouris lease and at a larger rental than the Skouris lease ". The " Rider " continues with the declaration that if the purchaser delivered such plans and such lease, then the seller undertook to obtain the first and second mortgagees' consent to the proposed alteration and the new lease; and that if the seller failed, then the purchaser was accorded the option of getting the return of his $25,000 deposit, or taking title without such consent. It is at such point that the " adjournment clause " was written into the " Rider." The " Rider " then immediately continued with the following clause: " It is agreed, however, that in the event the purchaser shall fail to furnish the plans and lease as hereinabove provided for within the time specified, the purchaser shall either take title under the terms and conditions herein provided for without the requirement on the part of the seller to obtain the consent herein provided for, or upon the failure of the purchaser to take title, all deposits made pursuant to this agreement shall be retained by the seller as liquidated damages and there shall be no further obligation in favor of one party as against the other."

The "Rider" then covered divers topics not presently relevant, such as existing incumbrances, personal property items, the physical condition of the premises, calculation of mortgage indebtednesses, objections to title, violations, unmarketability of title, and brokerage; and it then wound up with the reduction of purchase price or "amortization clause" previously quoted.

In our opinion the textual arrangement of the "Rider" makes evident that the parties had agreed to afford to the purchaser a 90-day period within which to make an effort to complete alteration plans and to negotiate a new Skouris lease; and to give to the purchaser the option of taking or leaving the property, dependent upon whether or not such plans and lease could be arranged. To better assure the completion of this task, the purchaser was given, as a matter of grace or good measure, the privilege of extending the 90-day period for an additional 60 days, so as to have a total of 150 days.

In the interim, obviously, by the terms of the first and second mortgages the seller would have to make mortgage payments, and the question concerning which of the parties should bear this burden was of practical importance. Whatever the parties actually intended, it suffices for present purposes to say that their "Rider" makes it evident that they bargained that the seller should bear the onus of the mortgage payments for a period of the first 90 days, to wit, "between the date hereof [Jan. 26, 1960] and the date fixed herein for closing [Apr. 26, 1960]". The parties left unmentioned and unanswered the question of responsibility for further mortgage amortization beyond April 26, 1960. In any event, there was no such express obligation placed on the seller for any period beyond that date.

Construing what the parties wrote, it appears to us that it may fairly be held that they signified that they intended to share between themselves the cost of mortgage payments for the 150-day period mentioned. They actually did share such payments on the basis of the seller absorbing them for the first 90 days, the initial period during which the purchaser was to go forward with alteration plans and a new lease. At the end of the 90 days, the purchaser could then decide whether its prospects of completing such plans and the new lease were possible of attainment and were of economic advantage to it, and it could then decide for itself whether to proceed to take title or to obtain a refund of its $25,000 deposit and to cancel the contract without charge or cost to it.

The conceded facts compel the conclusion that actually the purchaser marked time with its option beyond April 26, 1960, the date fixed for the closing. It was thus able to avoid the need

to put up an additional $25,000 in order to obtain a formal adjournment of the closing or the need to formally make up its corporate mind as to continuing with the project. The reasons for such indecision do not appear. The record states merely that on June 20, 1960, almost three months after the closing date fixed, the purchaser's attorney initiated the first of the four adjournments, which ultimately advanced the closing date to January 6, 1961. It is obvious that by June 20, 1960, the purchaser was faced with the contingency that almost all of its 150 days' grace period was about to expire, and that its prior $25,000 down payment might be in jeopardy. If, at that point, and in the later stipulations for adjournment, the purchaser's attorney, who prepared the documents, did not affirmatively provide for his client's exemption from the charge of after-accruing amortization payments, it seems reasonable to conclude that the reason for such omission on his part was his recognition that under the self-evident arrangement already made only the payments made during the first 90 days after contract were to be so exempted. In this context, the familiar rule is applicable: a document is to be construed most strictly against the party who drafted it; and is to be judged in the light of the situation of the parties at the time it was made (*Rentways, Inc., v. O'Neill Milk & Cream Co.,* 308 N. Y. 342, 348; *Reliable Press v. Bristol Carpet Cleaning Co.,* 261 App. Div. 256).

This rational construction of the contract is reinforced by technical reasons as well as by its own implicit logic. The key clause relied upon by the plaintiff (the purchaser's assignee) is that the purchase price was to be reduced to the extent of mortgage payments made by the seller " between the date hereof and the date fixed herein for closing ". The word " fixed " has been judicially defined as connoting " given " in the sense of " stated " (*Schirmer v. Rehill,* 57 Misc. 439, 442); and the word " herein " has been defined as referring to the document wherein it is found and not as a reference to any other writing (*Hartung v. People,* 26 N. Y. 167, 172). By these judicial standards, the clause under consideration may not be construed to signify any date for the purchaser's exemption from responsibility for the mortgage payments subsequent to April 26, 1960. Whatever meaning may be ascribed to the word " adjustments " in the subsequent stipulations, the provision therein to the effect that all " adjustments " shall be made as of the date of consummation of the transaction could not and did not, unless explicitly so stated, change April 26, 1960, " the date fixed herein [in the original document] " to any other date mentioned in the subsequent documents. In this context, the words " the date fixed

herein for closing," as used in the key clause, seem plain and unequivocal; they appear to have been chosen deliberately to carry out the fair and reasonable intention of the parties.

This last conclusion is further fortified by the fact that other parts of the contract refer in substance to the actual date of " closing of title," without restriction or limitation to the closing date fixed in the contract, namely, April 26, 1960. Since the key clause was used in the " Rider," wherein (it is common knowledge) special pains are always taken to define exceptions or departures from the conventional clauses found in the printed or main body of the contract of sale, the omission from the " Rider " of a provision for flexibility of " the date fixed herein " conveys the strong implication that such date was intentionally left unaltered. While, as plaintiff properly claims, a stipulation for adjournment effected the substitution of a later date for the date of closing specified in the original contract (*Clark* v. *Dales*, 20 Barb. 42, 64), such extension of time left " every other provision remaining intact, and to be carried out with the single modification as to time " (*Homer* v. *Guardian Mut. Life Ins. Co.*, 67 N. Y. 478, 481).

In sum, tested in light of the varying principles and methods of approach discussed, it seems plain to us that the contract here was unambiguous and precise in its mandate that the purchase price should be reduced by mortgage amortization payments made only up to April 26, 1960. To accept plaintiff's construction would be tantamount to holding that the parties intended that the purchaser could automatically secure a reduction of the purchase price by the device of obtaining an adjournment, despite the silence of the contract on such a material modification. Any such construction would conflict with what the parties wrote as well as with common sense. Even if it be assumed that such was the unexpressed intent of the parties, an unambiguous contract evolving out of undisputed facts may not be changed to conform to the unarticulated aspirations of one or both of the parties thereto (*Heller & Henretig* v. *3620–168th St.*, 302 N. Y. 326, 330). In conformity with this doctrine, it has been held that a purchase option (contained in a lease) which could be exercised " at any time " during its term, did not become part of 22 successive extension agreements which were made after expiration of the original term of the lease (*Gulf Oil Corp.* v. *Buram Realty Co.*, 11 N Y 2d 223, 227). In so holding, it was said that, although the extension documents referred to the original lease, they did not prolong the life of the option to purchase because they " contain no unmistakable language from which it may be found that the parties intended the purchase option to continue during

the periods of the extensions '' (*Gulf Oil Corp.* v. *Buram Realty Co., supra,* p. 227).

In conclusion, it may be noted that while the parties in their briefs address themselves at length to the question concerning which of them received the greater economic benefit from the various adjournments, there is no warrant, on the limited record before us, to decide this extraneous issue. As already pointed out, we are not at liberty to take a statement of fact from the brief of either party dehors the agreed statement of facts as submitted. In any event, regardless of which party received the better bargain, there survives for our consideration only the intendment to be gleaned from what they wrote.

As a consequence of the foregoing, we direct that judgment for the defendants be entered, without costs, as provided in the submission.

UGHETTA, Acting P. J., KLEINFELD, CHRIST and HILL, JJ., concur.

Judgment directed for defendants, without costs.