OPINION OF THE COURT
Beatrice Shainswit, J.
This is a dispute over the interpretation and application of a wage escalation clause in a lease dated December 19, 1956 — more than 25 years ago. Plaintiff is a former owner of the office building at 750 Third Avenue, the second of three owners since defendant tenant leased the space in 1956. Plaintiff claims that, for the eight years of its ownership, it had overlooked billing for increased rentals due under the wage escalation clause. This mistake in billing, according to plaintiff, had existed for about 25 years, i.e., since the commencement of the lease — but plaintiff is seeking to rectify the mistake only for the period of its own possession of the property.
Defendant has moved to dismiss the complaint for failure to state a valid cause of action. Plaintiff has cross-moved for summary judgment. Both sides have made extensive submissions and affidavits, and in essence both sides contend that there are no issues of fact, and that the controversy can be resolved by a judicial interpretation of *524 the lease provisions, against the backdrop of the lease history. The court agrees.
The tenant has occupied the second floor of the building since 1956, pursuant to a lease which provides for rent increases where wages paid -to building porters have increased. Specifically, the key paragraph, paragraph 46 of the lease, on this subject reads, in pertinent part: “46. If in the second or any subsequent lease year during the term of this lease, the basic rate of wages paid to building porters in and about said building (engaged in the general maintenance and operation of said building) shall increase or decrease from the basic rate paid to such porters during the first lease year hereof, the annual rental payable under this lease for such second or subsequent lease year shall be increased or decreased by 5 cents per square foot of space demised hereby per annum for each five per cent (5%) increase or decrease in such basic rate, as the case may be * * * Such increase or decrease in rental shall be in even multiples of 5 cents per square foot, and the percentage increases and decreases in such basic rate as aforesaid shall be ineffective to cause an increase or decrease in rental except as the same is a full five per cent (5%) or more, or a multiple of five per cent (5%) or more *** Within thirty (30) days after Tenant’s receipt of such notice from Landlord any adjustment in rental which may be effective for the then current lease year (taking into account any adjustment for a prior year which may already be reflected in the rental) shall be apportioned over the number of months of the current lease year then expired, but including the then current month in full, and paid by Tenant to Landlord or vice versa, as the case may be, and from thence forth all monthly installments of rental shall reflect one-twelfth (1/12) of the annual amount of such adjustment for the balance of such lease year and thereafter until a new adjustment becomes effective pursuant to the terms of this Paragraph 46. Notwithstanding the provisions of this Paragraph 46, the annual rental payable under this lease for any one lease year shall not be increased or decreased, by reason of such provisions of this Paragraph 46, by more than $8¿275 per annum” (Emphasis added.)
*525 It is the italicized portion around which the controversy revolves. Plaintiff claims that the language means that the maximum yearly increase in a given year is limited to $8,275 over the rent paid in the immediately preceding year (including all prior wage escalation increases). Defendant claims that the wage escalation provision creates an aggregate cumulative cap in wage-related rent increases over the rent paid in the first year of the lease.
For the following reasons, the court finds that defendant is entitled to judgment dismissing the complaint. It will treat the motion made for dismissal as one for summary judgment.
First: for 25 years, everyone involved with the lease — i.e., every successive owner as well as the defendant tenant — operated on the predicate that paragraph 46 provided an aggregate cumulative cap over the rent paid in the first year. Such ah unbroken history of practical construction provides its own telling definition of what paragraph 46 means. A mutual understanding rooted in 25 years of conduct is truly convincing evidence of what the original lessor and the defendant intended. (See Reltron Corp. v Voxakis Enterprises, 57 AD2d 134; Refrigeration for Science v Deacon Realty Corp., 70 Misc 2d 500; 3 Warren’s Weed, New York Real Property, Leases and Lettings, § 10.02; 4 Williston, Contracts [3d ed], § 623.)
Second: Bensons Plaza v Great Atlantic & Pacific Tea Co. (44 NY2d 791) reinforces the significance of the practical construction. In Bensons Plaza (supra, pp 791-792), a lease clause permitted rent increases to reflect real estate tax escalations: “‘provided, however, that in no event shall the rental fixed under this clause vary from the rental under this lease by more than $1,006.50 per year’.” As here, the parties urged similar conflicting construction. The landlord contended that the cap in the lease only limited the amount of the increase in any one year, with each preceding increase being built into the rent and carried forward to affect each succeeding year’s calculation. The tenant contended that the escalation clause provided an aggregate cumulative cap over the rent paid in the first year. The tenant prevailed. The Court of Appeals concluded that (p 793): “the highly probable inference is that *526 ‘the rental under this lease’ was intended to mean the rent stipulated for the first year. If the landlord intended otherwise, it should have been made explicit.” (Emphasis added.)
It is self-evident that the Bensons Plaza clause — “the rental under this lease” — is a close analog to “the annual rental payable under this lease for any one lease year”, the clause at issue in our case, and consequently the Bensons Plaza opinion is a particularly apt guideline for judicial construction.
The court construes paragraph 46 as providing an aggregate cumulative cap of $8,275 over the rent paid in the first year of the lease.
Third: a common-sense reading of paragraph 46 interdicts plaintiff’s version. As paragraph 46 indicates, the rent may only be increased in 5% multiples. The landlord’s bills, as reflected in the record on our motion, indicated that each 5% increase in porters’ wages became converted into a $1,655 rent increase. To reach the $8,275 ceiling therefore required five multiples of $1,655. In the entire 25-year history of this building, there never was a wage increase in any one year that involved more than five 5% multiples, so as to exceed the $8,275 cap. On the plaintiff’s theory, the cap would never have been triggered, despite the dramatic inflationary spiral that we are all experiencing. The court declines to give paragraph 46 a reading which would strip it of any meaning or effect, in providing the obviously intended protection of the cap. It is a basic maxim of contract law that consensual provisions are not to be construed to effect an absurd or totally unreasonable result.
Fourth: to support its position, plaintiff has built its argument on another paragraph of the lease, namely, paragraph 47. That paragraph deals with tax escalation, and provides that the additional rent prescribed by that paragraph’s formula: “shall in no event be more than $8,275 for any one lease year during such period commencing on the first day of the fourth year of the term of this lease and ending on the last day of said term and shall be non-cumulative. ”
Because of the use of the phrase “shall be non-cumulative”, in connection with tax increases, plaintiff argues *527 that, by “negative inference”, the wage escalation clause is cumulative and from this concludes, per se, that the cap is merely a limitation on each annual increment. Plaintiff’s contention about the significance of the presence or absence of the word “cumulative” is not contested by defendant. Defendant agrees that the wage escalation clause is cumulative. But defendant points out — and correctly, in the court’s view — that the issue is not whether wage or tax-related rent increases accumulate before reaching the cap of $8,275, but how that cap operates — i.e., whether there is an absolute aggregate ceiling above the initial rent, or simply a limitation on a particular year’s increase.
It is pertinent to observe that the wage escalation perforce was cumulative because defendant’s responsibility for wage escalation was measured in even 5% increments. A lesser wage increase had to await subsequent wage increases, so that the accumulated total would rise to the 5% level, to be passed through to the defendant. The tax escalation clause did not move in fixed increments. The clause provided for a pass-through of a portion of every tax increase, and there was therefore no reason to await accumulations in order to fix the tenant’s share. For this obvious reason, the lease provided that tax escalation was noncumulative. In consequence, plaintiff’s focus upon the use of the word “non-cumulative”, in the tax escalation provision, does not save the day for it. The entire 25-year history of rental billings reinforces the plain import, and objectives, of both paragraphs 46 and 47; paragraph 47 has nothing whatever to do with the question of construction of paragraph 46, and paragraph 46, by its plain terms, calls for a sensible construct that would give practical significance rather than an illustory reading and a cap that would never come into play.
Fifth: even if Bensons Plaza (supra) had never been decided by our highest court, and even if, by some alchemy, ambiguity was contorted into paragraph 46, plaintiff would still be confronted by the cardinal rule that the ambiguity would have to be resolved in favor of defendant. The original landlord, 750 Third Avenue Corp., Inc., drafted the lease, and the plaintiff and its predecessor would be subject to the binding rule that ambiguities are *528 resolved against the draftsman. (67 Wall St. Co. v Franklin Nat. Bank, 37 NY2d 245; Ditmars-31’ St. Dev. Corp. v Punia, 17 AD2d 357.)
Accordingly, from every perspective — the lease history, manifest intent and objective, plain reading, common sense, substantive law, and rules of construction — the conclusion is irresistible: there is no merit to the claim that after a building has been sold, the seller can now sue for additional rentals for back years, notwithstanding an unbroken two and one-half decades of history of practical construction to the contrary. It strains credulity that a sophisticated landlord, represented by competent counsel, simply overlooked its entitlement to a rent increase, and discovered the “mistake” only after the building had been sold. The complaint is dismissed. Summary judgment is granted to defendant.