## REFINEMET INTERNATIONAL COMPANY, Plaintiff,

v.

## EASTBOURNE N.V., Defendant.

### No. 88 Civ. 8527 (JES).

United States District Court,
S.D. New York.

March 10, 1993.

Grutman Greene & Humphrey, New York City (Norman Roy Grutman, Jewel Humphrey and Donald Zimmerman, of counsel), C. William Yanuck, New York City, for plaintiff.

---

Winston & Strawn, New York City, for defendant; Edward N. Meyer and Suzanne R. Dyer, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

Refinemet International Company ("Refinemet" or "plaintiff") brings this action for damages against Eastbourne N.V. ("Eastbourne" or "defendant") for breach of an indemnification agreement, and for a declaration of Eastbourne's future liability for continuing reimbursement of expenses paid or incurred by Refinemet. The Court having held a bench trial, having seen and heard the witnesses, having reviewed in detail the exhibits proffered by the parties, finds in favor of the defendant. Accordingly, for the reasons that follow, judgment shall be entered for the defendant. The following shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## BACKGROUND

On December 31, 1979, Refinemet International Company, Ag–MET, Inc., and R.I.C. Corp., executed a merger agreement whereby Refinemet would merge into R.I.C., Ag–MET's wholly-owned subsidiary. See Joint Pre–Trial Order ("PTO"), Exhibit A, Attachment A, ¶ M. On that same date, expressly to induce Refinemet to enter into that merger, see Plaintiff's Exhibit ("Pl.Ex.") 174, Ag–MET entered into an Equity Contribution Agreement ("the Agreement") with Eastbourne, a company affiliated with Refinemet.[1] See PTO, Ex. A, Att. A, ¶ S. At that time,

those companies shared a common stockholder, the Empain Schneider group, a group which had interests in a large collection of different companies. See PTO, Ex. A, Att. A–1, ¶ B; Trial Transcript ("Tr.") at 35–38.

Under the Agreement,[2] Eastbourne was obligated to make capital contributions to Ag–MET in amounts equal to its paid or incurred obligations. For Ag–MET, which sometime thereafter changed its name to Refinemet, those expenses principally included expenses associated with environmental clean-up and proliferating litigation with respect to environmental violations. The Agreement limited coverage to expenses arising out of events which occurred prior to December 31, 1979, and required that Refinemet give notice of all claims to Eastbourne by March 31, 1982. See Pl.Ex. 174.

On or about March 18, 1982, plaintiff requested and received an indefinite extension of time for plaintiff to give notice of claims which they were then processing. Realizing that it could not meet the March 31 deadline, in large part due to Refinemet's chaotic bookkeeping conditions, Tr. at 97–98, 311, 374, 393–94; see also Pl.Ex. 8, the parties executed a letter agreement so amending the Agreement. See PTO, Ex. A, Att. A, ¶ V; Pl.Ex. 8.

On January 7, 1983, the parties further amended the Agreement in conjunction with an anticipated sale of Refinemet. The purchaser, Mr. Mandel Sherman, testified that the financing for that transaction, provided primarily by the Chase Manhattan Bank, depended on an assurance of coverage under the Agreement. Tr. at 423, 441. As consid-

---

1. In 1979, Eastbourne owned 18% of Refinemet's outstanding stock and held a subordinated promissory note convertible after March 31, 1980 into 50% of Refinemet's outstanding stock after conversion. See PTO, Ex. A, Att. A, ¶ D.

2. The Agreement states in relevant part:

   1. In the event that Ag–MET or any of its [non-excepted] subsidiaries ... shall actually expend funds in payment of, or incur expenses, including, without limitation, reasonable attorneys fees and expenses in connection with:
   (a) any claim against Ag–MET and/or the Subsidiaries relating to litigation commenced prior to the consummation of the merger; and

   (b) any liability or obligation of, or claim against, Ag–MET or any of the Subsidiaries existing on the date of the consummation of the Merger or arising out of events which occurred prior to the consummation of the Merger, which, on or before such date has not been disclosed ... then ..., [Eastbourne] shall contribute to the capital of Ag–MET an amount equal to the excess of such after-tax cost over the sum of (i) $200,000, plus (ii) the after-tax benefit of all amounts received by Ag–MET or the Subsidiaries pursuant to any right or claim of Ag–MET or the Subsidiaries existing at, or arising out of events occurring on or prior to the consummation of the Merger....
   Pl.Ex. 174.

eration for that assurance, Refinemet agreed to pay Eastbourne the net proceeds from a sale of property located in Kearny, New Jersey, which was owned by Newtown Refining Corp. ("Newtown"), Refinemet's wholly-owned subsidiary. *See* Pl.Ex. 445.

On May 11, 1984, under mounting pressure from Chase Manhattan for further security for the aforesaid financing, Refinemet caused Newtown to grant Chase a $40,000,000 first mortgage lien on the Kearny property without consulting Eastbourne. *See* PTO, Ex. A, Att. A, ¶ FF; Pl.Ex. 423. When they learned about that mortgage in late 1984, Eastbourne was assured by Newtown's counsel that Chase would release its lien once the property was sold. Tr. at 143, 162–66, 180; Pl.Ex. 51, 424, 425, 427.

However, when Newtown sold that property on March 5, 1985, the net proceeds were transferred to Chase to satisfy the mortgage without Eastbourne's consent. *See* PTO, Ex. A, Att. A, ¶ II. Eastbourne learned about the Kearny sale and that it would not receive the bargained for proceeds on or about March 7, 1985. As a consequence, first on March 8, 1985, then later on March 14 and 19, Eastbourne declared by telexes sent to Refinemet that the Agreement was terminated due to Refinemet's breach.[3] *See* Pl.Ex. 47; Def.Ex. C, J. On December 2, 1988, Refinemet filed the instant suit.[4]

The Court held a four day bench trial. At the outset, it should be noted that Refinemet's counsel, Mr. Norman Roy Grutman, rejected the Court's offer to postpone the trial based on the Court's perception that plaintiff did not appear ready to proceed. However, as the trial progressed, it appeared that many matters normally resolved pre-trial had not been accomplished. For example plaintiff had not yet produced many of Refinemet's books and records, including a number of its cancelled checks and its corporate tax returns for the years 1985–1989. Nevertheless, repeatedly noting that the law favors admission of evidence in non-jury trials and that its own practice for bench trials is to take evidence subject to a subsequent motion to strike, the Court received into evidence check duplicates in place of the missing cancelled checks and permitted testimony regarding schedules based on the unproduced tax returns.[5]

As a further accommodation, the Court, on plaintiff's request, granted a continuance in the middle of the trial in order to enable plaintiff's counsel to conduct a trial deposition of Sherman who, it was explained, was beyond the subpoena power of the Court and would not appear voluntarily. Counsel also represented to the Court that he would return to court with the unproduced books and records. Tr. at 324–25, 360–61. However, when the trial reconvened after what amounted to a seventeen day continuance, no such books and records were produced, and, although his deposition had been taken on the basis of a representation that he would not appear, Sherman did in fact appear to testify. Finally, after the close of testimony, the Court, over defendant's objection, received into evidence the previously unproduced corporate tax returns belatedly offered by plaintiff although testimony about them had already been completed.

After the trial concluded, but before the scheduled final arguments, plaintiff submitted a motion to reopen the record for the

---

3. In addition, Refinemet also refused to return to Eastbourne a sum advanced by it to Refinemet under the Agreement to pay a tax claim which was later refunded after the Internal Revenue Service reversed its position concerning Refinemet's liability for that claim. Defendant's Exhibit ("Def.Ex.") HH.

4. In October, 1987, Refinemet filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Central District of California, *see* PTO, Ex. A, Att. A, ¶ B, but received permission to bring this action by Order of the bankruptcy court dated September 7, 1988. *See* Complaint, ¶ 3.

5. Although plaintiff's co-counsel Mr. C. William Yanuck had intimated that the tax returns could not be found, *see* Tr. at 225–26, its own witness later revealed that they had in fact been in California the entire time. Tr. at 332–34. Moreover, once made aware of the Court's disinclination to credit the check duplicates as reliable evidence, Tr. at 399–403, plaintiff's counsel prompted one of their witnesses to gather many of the cancelled checks after the trial had ended. *See infra* pp. 740–41.

purpose of offering previously unproduced cancelled checks. Plaintiff submitted its motion without having first had a pre-motion conference as required by the Court's individual rules. The motion was supported by an affidavit of Norman Greenstein, an accountant at Refinemet, which stated that, at the request of counsel, he had made a thorough search of the relevant files since the inception of this lawsuit, *see* Affidavit of Norman Greenstein sworn to May 21, 1991 ("Greenstein Aff."), ¶¶ 8, 10, a statement which flatly contradicted his previous trial testimony that he had not bothered to look for the cancelled checks. Tr. at 397–402.

In its discretion, *see Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–33, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971); *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985), the Court denied plaintiff's motion finding, in light of the facts and circumstances surrounding plaintiff's behavior with respect to discovery and the maximum indulgence previously shown to plaintiff by the Court, that plaintiff had not demonstrated that its failure to produce such evidence at least before the end of the trial was not the result of its own lack of diligence. *See Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 622 F.Supp. 208, 214 (S.D.N.Y.1985), *aff'd,* 805 F.2d 49 (2d Cir.1986); *Reconstruction Fin. Corp. v. Commercial Union of Am. Corp.,* 123 F.Supp. 748, 750 (S.D.N.Y.1954).

On July 12, 1991, the Court heard final arguments and made oral findings on the record with respect to liability. The Court reserved decision on an issue relating to damages, *i.e.,* whether indemnification should or should not be made on an actually paid basis as opposed to an incurred basis, and scheduled further summation with regard to that issue. Counsel for Refinemet subsequently waived summation and declined to appear.

## DISCUSSION

■ As reflected in the July 12 transcript, the Court finds that Refinemet breached the Equity Contribution Agreement when it did not pay Eastbourne the net proceeds of the sale of the Kearny property. The Court rejects Refinemet's arguments that its breach of the Agreement was not material and that that breach therefore does not disqualify it from receiving Eastbourne's continued reimbursements under that Agreement. *See Manhattan Life Ins. Co. v. Prussian Life Ins. Co.,* 296 F. 39, 42 (2d Cir.1924); *see also Printers II, Inc. v. Professionals Publishing, Inc.,* 784 F.2d 141, 148 (2d Cir.1986).

In support of that conclusion, the Court relies on the clear language of the contract,[6] *see, e.g., Raleigh Associates, Inc. v. Henry,* 302 N.Y. 467, 473–76, 99 N.E.2d 289 (1951); *Ditmars–31' Street Dev. Corp. v. Punia,* 17 A.D.2d 357, 235 N.Y.S.2d 796, 800 (2d Dep't 1962), and further on the testimony of Mr. Sherman, Refinemet's own witness, that Refinemet promised to pay Eastbourne the net proceeds from a sale of the Kearny property because Eastbourne insisted on that promise as an essential condition to its reconfirmation of its coverage under the Agreement.[7] Tr. at

---

**6.** Refinemet's promise to pay the net proceeds from the sale of the Kearny property, which, along with payment from a sale of another property, were the only obligations undertaken by Refinemet under the January 7, 1983 amendment, is clear and unambiguous:

> 6. *Anything to the contrary herein notwithstanding,* Ag–MET (now known as Refinemet International Company) *shall* promptly pay or cause to be paid to the Company (a) an amount equal to the difference between: (i) the amount received by Newtown Refining Corporation ("Newtown") on the sale of the property owned by Newtown located in Kearny, New Jersey, less (ii) $47,790 [its book value], and (b) an amount equal to the difference between (i) the amount received by Newtown on the sale

of the property owned by Newtown located in Palmer, Massachusetts, less (ii) $50,572.

Pl.Ex. 224 (emphasis added).

**7.** The following exchange took place during cross-examination of Sherman by Eastbourne's counsel:

> Q. Mr. Sherman, just one quick thing. When you were making this deal in 1983, you wanted that equity contribution to stay in force, did you not?
>
> A. Sure.
>
> Q. That was important to you?
>
> A. Yes.
>
> Q. That was important to Chase [Manhattan Bank, the lead lender in Sherman's acquisition of Refinemet]?
>
> A. Yes.

439–447. That condition was bargained for at arm's length by sophisticated businessmen, and the Court may not, for Refinemet's benefit, remake or ignore it. It follows that Refinemet's material breach justified Eastbourne's termination of its duty of performance thereunder. *See Emigrant Indus. Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 144, 48 N.E.2d 293 (1943).

■ Refinemet argues that since Eastbourne continued its performance under the contract after learning that Refinemet had granted the mortgage lien to Chase, their termination was untimely and invalid. *See Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969). However, the evidence is clear that Eastbourne was lulled by assurances from counsel for Newtown, Refinemet's wholly-owned subsidiary, that Chase would release its lien. Tr. at 162–66, 180; Pl.Ex. 424, 425, 427. Indeed, Eastbourne's notice to Refinemet of its termination of the Agreement was made within several days of learning, for the first time, that Chase was not going to waive their lien and enable Eastbourne to receive the proceeds for which it had bargained. *See, e.g., Apex, supra*, at 562; *Filmline (Cross–Country) Productions, Inc. v. United Artists Corp.*, 662 F.Supp. 798, 804–05 (S.D.N.Y.1987), *aff'd*, 865 F.2d 513 (2d Cir.1989); *Emigrant, supra*, 290 N.Y. at 144, 48 N.E.2d 293.

Next, plaintiff contends that Eastbourne resorted to that breach as a pretext to terminate the contract and thereby avoid potentially prohibitive future liability as Refinemet's indemnitor. However, since Eastbourne had the legal right to terminate its obligation under the contract, it is legally irrelevant whether Eastbourne was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract. *See Loma Linda Univ. v. District–Realty Title Ins. Corp.*, 443 F.2d 773, 779 (D.C.Cir.1971); *Filmline (Cross–Country) Productions, Inc. v. United Artists Corp., supra*, 662 F.Supp. at 804 n. 5.[8]

■ Refinemet also asserts that its obligation to pay the Kearny proceeds is severable from the rest of the contract, and that, in any event, it substantially performed its duties under the contract. These claims lack merit. Under New York law, the measure of whether a contract's provisions are severable is a question of intent, determined from the language of the contract and the circumstances under which the contract was made. *See Christian v. Christian*, 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 365 N.E.2d 849 (1977); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1098–99 (2d Cir.1992). Plaintiff has failed to show the presence of any circumstances existing at the time the

Q. And they wanted, Eastbourne wanted, the net off the Palmer[, Massachusetts] and Kearny property, isn't that right?
A. Yes.
Q. And you gave it to them?
A. Yes.
Tr. at 439.
Q. You didn't care about it. They could have it if they wanted it.
THE COURT: The question is, they cared about it.
Q. They cared about it, that's all.
A. Yes.
Tr. at 442.
THE COURT: Don't interrupt my examination. The bottom line here is, they said we want this provision in, and you said yes.
THE WITNESS: Yes.
THE COURT: That is all I need to know. Anything further?
Tr. at 447.

**8.** Moreover, the evidence does not bear out any charge of pretext. Mr. Mahmoud Tiar, President of Elican Holdings, Inc., which was a managing director of Eastbourne during the relevant period, *see* PTO, Ex. A., Att. A., ¶ E, testified that, after learning that Refinemet had granted Chase Manhattan a mortgage on the Kearny property, Eastbourne did not seek ways to get out of their contractual obligation to Refinemet, Tr. at 166, but rather sought to ensure that Eastbourne not get saddled with primary responsibility for Refinemet's debts in case Refinemet should go into bankruptcy. Tr. at 166–68, 172–73, 177–78. Tiar's December 13, 1984 memorandum, *see* Def. Ex. N, outlines Eastbourne's attempt to make Refinemet pay all bills first by changing their own practice of directly paying Refinemet's legal bills and amounts due to the Environmental Protection Agency. Eastbourne feared that if it continued to make direct payments, those and other creditors, aware of Refinemet's deteriorating financial strength, might be tempted to inflate their bills. Tr. at 167. The Court finds Tiar's testimony credible and Eastbourne's concerns reasonable and not indicative of pretextual behavior.

contract was made which would warrant treating their promise to pay Eastbourne from the Kearny sale proceeds as severable. To the contrary, Sherman admitted that that promise was important to a further assurance of coverage under the Agreement which was essential to securing financing for his buyout of Refinemet. Tr. at 439–447.

Moreover, in the absence of any language in the contract stating it to be enforceable notwithstanding a breach of the provision to pay the promised Kearny sale proceeds, the Court declines to rewrite a contract negotiated at arms length to insert a severability clause which neither of these parties saw fit to insert in the contract.

The two cases on which Refinemet relies in support of its argument of substantial performance, *Jacobs & Youngs v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921) and *Hadden v. Consol. Edison Co. of New York, Inc.,* 34 N.Y.2d 88, 356 N.Y.S.2d 249, 312 N.E.2d 445 (1974), *modified,* 45 N.Y.2d 466, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978), are legally and factually inapposite. Plaintiff's reading of *Hadden* ignores the ultimate result in the case, *i.e.,* that defendant company was permitted to terminate its pension obligations to an employee of 37 years who had taken a bribe from firms doing business with his employer where the clear terms of the Pension Plan declared that those discharged for cause would not be entitled to pension rights. *See Hadden,* 45 N.Y.2d 466, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978). That case therefore applied the clear language of the contract notwithstanding the alleged harshness of the result and supports the Court's conclusion here.

■ *Jacobs & Youngs* articulates the New York law of substantial performance, but applies that doctrine specifically to "the transgressor whose default is unintentional and trivial[,]" and not to "[t]he willful transgressor[.]" *Jacob & Youngs, supra,* 230 N.Y. at 244, 129 N.E. 889; *accord Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980). In the

instant case, the proof at trial leaves no doubt that Refinemet's default under the terms of the agreement was neither unintentional nor trivial, but clearly a willful breach of a material term of the contract. It is of no legal consequence that Refinemet's dire economic circumstances led them to a business decision to satisfy another creditor at Eastbourne's expense. Moreover, Eastbourne did not receive substantially what it bargained for, and, given that circumstance, Refinemet cannot be said to have substantially performed under the Agreement's terms.[9] *See Hadden, supra,* 34 N.Y.2d at 97–98, 356 N.Y.S.2d 249, 312 N.E.2d 445.

Finally, at trial Refinemet raised the argument that even if the January 7 agreement had been materially breached and properly terminated, Eastbourne's obligations under the Agreement nevertheless continued according to the terms of the March 18, 1982 letter agreement which extended Refinemet's time to submit claims. The Court rejects that argument as a matter of fact for the following reasons. The parties entered into the March 18 letter agreement primarily as a result of Refinemet's administrative problems, to wit, their chaotic bookkeeping conditions and "pressing business considerations" which hampered its ability to ascertain all claims with particularity. *See* Pl.Ex. 8. There is not a shred of evidence in the record, nor language in the letter agreement itself, which suggests that that agreement, standing alone, bound Eastbourne in perpetuity even after Refinemet was sold outside the Empain Schneider group.

Therefore, the Court finds that Eastbourne's extension of time was unquestionably intended as a limited courtesy to Refinemet and certainly not intended to survive the transfer of ownership to Mr. Sherman. In fact, Sherman, at Chase's insistence, negotiated an assurance from Eastbourne of coverage beyond that provided for under the Agreement and the aforesaid letter agreement, and agreed, as consideration for that

---

9. In any event, the doctrine of substantial performance, which is designed to avoid forfeitures, *see, e.g., Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir.1993) (per curiam), does not apply where, as here, the contract clearly requires compliance with the unperformed obligation as an essential condition to defendant's obligations. *See, e.g., Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 113 (2d Cir.1985).

assurance, to pay Eastbourne the net proceeds from the sale of the Kearny property.

In sum, at the time Eastbourne entered into that letter agreement, it was affiliated with Refinemet. As a shareholder of Refinemet before its sale, Eastbourne had had an economic interest in, and had stood to benefit by, Refinemet's continued economic viability. In the context of a sale of its stake in Refinemet, it is not reasonable to conclude, and certainly not more probable than not to find, that Eastbourne intended to extend the Agreement on an open-ended basis.[10]

Accordingly, having found that Eastbourne's termination of the contract was, in all respects, proper, and having further rejected Refinemet's arguments that the contract was valid and continuing in effect, the Court turns to the sole issue remaining, namely, the extent of Eastbourne's liability for pre-termination damages. Eastbourne does not dispute its liability for such damages, but contends only that plaintiff has proved no damages because it paid out more than Refinemet has shown was owed.

Cancelled checks issued by Eastbourne in evidence demonstrate that it paid $1,423,688.13 pursuant to its obligations under the Agreement, $1,134,977.35 of which was paid as reimbursements to Refinemet and $288,710.78 of which was paid directly to Refinemet's creditors. Pl.Ex. 90, 92, 230–31; Def. Ex. III, JJJ. By contrast, Refinemet's cancelled and duplicate checks, even assuming that the Court accepts all of them as valid, a

gratuitous assumption at best given the circumstances of this case, show that its own disbursements prior to March 8, 1985, for which they would arguably be entitled to indemnity from Eastbourne totals $456,917.33, far less than the sums paid out by Eastbourne. Similarly, the sum of all invoices offered by Refinemet as evidence of incurred expenses is $843,344.82, again, far short of the amount paid by Eastbourne.

Furthermore, even were Refinemet permitted to combine checks with invoices, a process that would doubtless include instances of double counting where invoices had been satisfied by payment, the maximum amount of damages that Refinemet could possibly prove is $1,300,262.15, an amount the undisputed evidence establishes was paid by Eastbourne. On that evidence alone, the Court finds it more probable than not that Eastbourne reimbursed Refinemet for all amounts for which it is conceivably liable.[11]

## CONCLUSION

Accordingly, for the reasons stated above, the Court finds in favor of the defendant and the complaint is dismissed with prejudice. The Clerk of Court shall enter an appropriate judgment and close the above-captioned action.

It is SO ORDERED.

---

10. Similarly, though the two companies had common directors before Sherman bought Refinemet, see PTO, Ex. A, Att. A, ¶¶ I, J, K, that situation changed upon the completion of the transaction on February 15, 1983, see Pl.Ex. 444, when three common directors terminated their positions with Refinemet, see PTO, Ex. A, Att. A, ¶ K, and a fourth, Muller, resigned from Eastbourne soon thereafter on August 26, 1983. Id., ¶ I; Tr. at 85–87; see also Tr. at 70.

11. Because plaintiff, under any theory of the case, cannot prove that it is entitled to damages, the Court need not consider defendant's further arguments with respect to plaintiff's proof of damages nor evidence that Eastbourne paid out substantially more even than that set forth above. See Tr. at 133; see also Plaintiff's Post–Trial Memorandum of Law at 21. The Court notes in passing, however, that Refinemet's proof of damages was both spurious and defective. That

proof consisted largely of check duplicates lacking any marks of cancellation which are not the best evidence that payment was made and are therefore suspect. See Ruberto v. Commissioner, 774 F.2d 61, 64 (2d Cir.1985); see generally Fed.R.Evid. 1003; N.Y.Civ.Prac.L. & R. 4539 (McKinney 1992). Moreover, the Court need not determine whether plaintiff proved that its expenses exceeded $200,000 after adjustments made for tax costs and benefits as provided for in the Agreement. Neither need the Court determine whether Refinemet is entitled to reimbursement on an actually paid or incurred basis, especially given the circumstance of Refinemet's bankruptcy. See July 12, 1991, Transcript at 46–47. Finally, the Court expresses no opinion on the prejudice to defendant of the admission into evidence of documents not listed in the joint Pre–Trial Order which stipulated that any exhibits not listed therein would be precluded.