BROWNSVILLE COMMUNITY COUNCIL, INC., Plaintiff,

v.

BANCO DE PONCE, Defendant and Third-Party Plaintiff,

v.

HUMAN RESOURCES ADMINISTRA-TION OF the CITY OF NEW YORK, The Community Development Agency, Stanley Brezenoff, as the Administrator-Commissioner of the Human Resources Administration of The City of New York, Roger Alvarez, as the Commissioner of the Community Development Agency and The City of New York, Third-Party Defendants.

No. 80 Civ. 5416–CSH.

United States District Court, S.D. New York.

June 16, 1983.

**850**

Morton L. Portnoy, New York City, for plaintiff.

Burke & Burke, New York City, for defendant third-party plaintiff; George Harris, New York City, of counsel.

Frederick A.O. Schwarz, Corp. Counsel, New York City, for City of New York; Sylvia L. Beckey, Asst. Corp. Counsel, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Brownsville Community Council, Inc. ("BCC") brings this action to recover $97,730.30 remitted to the City of New York by defendant Banco de Ponce ("the Bank") allegedly in violation of the Bank's implied contractual obligation to BCC as depositor of the funds. The Bank has brought a third-party action against the Human Resources Administration of the City of New York ("HRA"), the Community Development Agency ("CDA"), their respective commissioners, and the City of New York (hereinafter collectively referred to as "the City") on a theory of indemnification and money had and received. The case is presently before the Court on (1) plaintiff's motion for summary judgment; (2) defendant's motion for summary judgment against third-party defendants; (3) third-party defendants' motion to dismiss the complaint or, in the alternative, to dismiss defendant's third-party complaint against the City; and (4) third-party defendants' motion for leave to amend its answer.

With regard to the latter motion, the City's request to amend its answer is granted insofar as it seeks to specifically assert against plaintiff the various defenses initially asserted against third-party plaintiff. Further, in light of the numerous affidavits and documentation submitted to the Court with these motions, the City's motion to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b)(6) will be treated as one for summary judgment pursuant to Fed.R. Civ.P. 56.

## I.

*Factual Background*

Essential to an understanding of the issues now before the Court is a review of the lengthy and at times acrimonious history of the parties to this action.

The Community Development Agency is an administrative agency of the City of New York under the jurisdiction of the Human Resources Administration. CDA is responsible for administering the Community Action Program in New York City, a neighborhood assistance program established in 1972 pursuant to the Economic Opportunity Act of 1964, as amended, 42 U.S.C. § 2781 *et seq., repealed* Pub.L. 97–35, Title VI, § 683(a), 95 Stat. 519 (Aug. 13, 1981), and Mayor Executive Order Number 28 (1966), as amended by Executive Orders 84 (1968) and 34 (1975). To manage the federal and municipal funds thus allocated for community assistance activities, CDA initially designated twenty-five community corporations as umbrella organizations for their respective communities. In October of 1972, CDA entered into a one-year contract with plaintiff Brownsville Community Council for the term October 1, 1972 to September 30, 1973, whereby BCC became the community corporation for the Brownsville area of Brooklyn. Pursuant to its prime contract with CDA, BCC subcontracted with approximately eighteen delegate agencies deemed by BCC to meet the service needs of the Brownsville area. BCC

supervised the fiscal and administrative operations of these various delegate agencies and, as a conduit of anti-poverty funds, was directly accountable to CDA for all Brownsville program activities. (Chow-Menzer Aff., ¶¶ 2–3). During the contract period, BCC opened numerous accounts with defendant Banco de Ponce for the deposit of individual program funds.

In August of 1972, as then required by federal regulation, 42 U.S.C. § 2791(b); 45 C.F.R. § 1062.200–3(a), BCC conducted a board of directors election. As set forth in the affidavit of David Murray, Director of Programming and Reporting of the Community Development Agency, CDA discovered subsequent to the election that BCC's by-laws, unlike those of the other community corporations, did not conform to the election policy approved by CDA, a policy specifically intended to ensure an ethnic balance on the community corporation's board (Murray Aff., ¶¶ 2–3).[1] As a result of continuing disputes relating to the BCC board of directors election,[2] the New York City Council Against Poverty ("CAP") voted on

August 13, 1973, to withdraw recognition of BCC pursuant to CAP's oversight authority.[3] In a letter dated August 15, 1973, to William Fred Wilson of the BCC, the Commissioner of the Community Development Agency notified BCC as follows:

"The Brownsville Community Council, Inc. is being terminated in accordance with Article VIII of the Direct Program Grant Contract and Article X of the Prime Contract, Section B, Part (1) (iv) and Part 3, which state:

'B. *CDA's Right to Terminate.*

(1) CDA shall have the right to terminate agreement under the following conditions:

(iv) Other circumstances which cause CDA to deem that it is in the best interest of CDA to terminate this agreement.

(3) CDA may terminate this agreement without cause, subject to the conditions of the applicable federal grant, by giving two (2) weeks written notice to the Community Corporation.'

1. Thirty-five BCC board members (two-thirds of the board) were elected in August of 1972 in accordance with CDA's election policy. This policy also called for appointment of an additional sixteen members to achieve ethnic balance within the community corporation's area of operation (Murray Aff., ¶ 2). BCC's by-laws, however, required the remaining board members and officers to be elected by BCC's General Assembly rather than appointed, and a second election was held in October of 1972. Subsequent to the election, Robert Storey, a defeated BCC presidential candidate, brought suit in New York Supreme Court to invalidate the election. In a decision dated April 30, 1973, the court determined, after extensive hearings, that the election was invalid and ordered that a new election be held under the supervision of CDA. Pending that election, BCC's former officers were designated "acting officers" by the court. (*Matter of Storey v. Askew,* Index No. 23783/72, April 30, 1972, Sup.Ct., Kings Co.).

2. The new election, *see* n. 1, *supra,* was to have been held on July 18, 1973. Prior to that time, CDA suspended BCC's board of directors and officers, an action the court found to be without authority, given that these individuals had, in effect, been appointed to interim positions pending the July election. CDA was, however,

still charged with supervision of the balloting. On the eve of the election, acting BCC president William F. Wilson called a special board meeting, at which it was determined that the election should be postponed indefinitely. Mr. Wilson had the locks changed at the polling place to prevent entry by CDA officials and was thereafter held in contempt of court for his actions (N.Y.L.J., Aug. 13, 1973, p. 11, col. 3). The election finally went forward on August 8, 1973, under the supervision of the court-appointed Honest Ballot Association, with Mr. Wilson and his supporters victorious. CDA alleged "numerous irregularities" in the August election and expressed dissatisfaction with the Honest Ballot Association's supervision (Murray Aff., ¶ 4(e)).

3. Pursuant to Mayor Executive Order No. 28, CAP was given the responsibility:
"(a) for determining overall program plans and priorities for the City's attack on poverty; and
"(b) to provide for a creation and recognition of community corporations as primary instruments of citizens participation and community action in particular areas of the City, as required by the federal enabling statute, *see, e.g.,* 42 U.S.C. § 2791." (Beckey Aff., ¶ 9).

During the interim thirty (30) days, August 31, 1973 to September 30, 1973, the Brownsville Community Council, Inc. will comply with all close-out procedures, as stated in the Prime Contract. Article X, *Termination of Agreement,* Section D, *Procedure Upon Termination,* Section E, *Liability for Breach: Set-off,* and Article XII, *Continuing Programs Subsequent to Termination.*" (Beckey Aff., Exh. C).

Attached to the Commissioner's letter was a notice of termination and a detailed listing of close-out procedures to be followed by BCC (Beckey Aff., Exh. C). As set forth in Article VIII of the prime contract, these procedures included BCC's obligation to:

"[1] Account for and refund to the Agency, within thirty [30] days, any unexpended funds which have been paid to the Contractor pursuant to this agreement.

"[2] Furnish within thirty [30] days an inventory to the Agency of all equipment, appurtenances and property purchased for the program and carry out any Agency directives concerning the disposition thereof.

"[3] Not incur or pay any further obligations pursuant to this agreement beyond the termination date except necessary termination expenses.

"[4] Make available to the Agency or its designees all documents, reports and material related to this agreement.

"[5] Submit, within ninety [90] days, a final report of receipts and expenditures of funds relating to this agreement. The report shall be made by a certified public accountant or a licensed public accountant."

On August 30, 1973, the Brownsville Panel of the Council Against Poverty convened a hearing to consider the withdrawal of BCC's recognition. After one and one-half hours of testimony from Brownsville residents, followed by a discussion of this testimony, the Panel voted to uphold the Council's action.

The anticipated withdrawal of BCC recognition by CDA prompted additional litigation in state court. CAP and CDA sought invalidation of the August 8, 1973 election, see note 2, *supra,* and control of BCC, while BCC sought to validate the election and to stay CAP and CDA from terminating its contract. After a convoluted procedural history,[4] the election issue was mooted and the focus shifted to the propriety of CDA depriving BCC of its status as the anti-poverty agency in Brownsville. In a proceeding brought by BCC to permanently enjoin its termination, the corporation alleged that the City's actions were prompted by improper political motives. Justice Samansky of the New York State Supreme Court, in an opinion dated November 16, 1973, found that BCC's allegations set forth a cause of action under "Article 78 CPLR to annul a determination of a governmental body or officer," *Brownsville Community Council, Inc. v. Human Resources Administration,* N.Y.L.J., Nov. 26, 1973, p. 17, col. 4 (Sup.Ct. Kings Co. 1973), and granted a temporary injunction pending further proceedings. The Court went on to note that while BCC had not established any right to a renewal of its contract, which had expired by its own terms on September 30, 1973, "it is the opinion of this court that the rights of the citizens of Brownsville must be protected and that, if the allegations made by BCC are proven, CAP and CDA would in effect be depriving the community of its voice in the anti-poverty program without just cause." *Id.* On August 28, 1974, the parties stipulated to a discontinuance of BCC's action, a withdrawal of the City's notice of appeal, and a vacation of the temporary injunction granted by Justice Samansky.

4. For a review of the proceedings in state court, *see Brownsville Community Council, Inc. v. Human Resources Administration,* N.Y.L.J.,

Nov. 26, 1973, p. 17, col. 4 (Sup.Ct. Kings Co.1973).

The various community programs formerly administered by BCC continued intact after BCC's termination, their funding now administered by the Brownsville Community Action Association ("BCAA"), the CAP-designated successor to BCC. However, as averred by Kathryn Ivey, Deputy Assistant Commissioner of CDA's Department of Fiscal Administration, BCC did not comply with the CDA close-out procedures set forth in the notice of termination and failed to return those program funds not expended during the contractual period (Ivey Aff., ¶ 6). In a letter dated January 20, 1975, directed to Sr. Roberto Ortiz, manager of defendant Banco de Ponce's Pitkin branch, CDA Commissioner Peter Lugo requested that the remaining funds held in BCC's accounts be paid to the Human Resources Administration, Bureau of Internal Audit. Commissioner Lugo's letter further stated that:

"The Human Resources Administration hereby agrees to indemnify you and hold you harmless from any claim in connection with the payment to us of these funds and agrees that in the event of a claim concerning this payment and a determination that the claimant is entitled to funds by the Human Resources Administration, or the Banco De Ponce, the bank may charge an appropriate account of the Human Resources Administration for the amount of the payment after giving seven (7) days notice." (Beckey Aff., Exh. E).

On January 22, 1975, the Bank closed plaintiff's various accounts and remitted $97,730.30 to the City of New York, Community Development Agency.

## II.

*Discussion*

Plaintiff BCC moves for summary judgment against defendant Banco de Ponce on the ground that the Bank "breached its depositor obligation to BCC" by remitting to the City of New York the funds remaining in plaintiff's various accounts without BCC's authorization. In urging its position upon the Court, plaintiff contends that the facts are undisputed and that the applicable legal principle is simple: "if the bank attempts to pass upon the right of an adverse claimant to the fund, and pays over to him any part thereof, it becomes responsible for the amount so paid" (Pl. Mem. in Opp. at 6, quoting 9 N.Y.Jur.2d § 286).

After considering the various documents and affidavits submitted to the Court, I cannot agree that the issue is as straightforward as plaintiff suggests. While it is not disputed that BCC opened various accounts at Banco de Ponce's Pitkin branch pursuant to its contractual authority as a CDA-designated community corporation to "establish and maintain a bank account to be used only for the program," Part II, Art. II, sec. (B)(1), plaintiff's contention that this initial act establishes its allegedly perpetual and exclusive authority to withdraw the funds deposited therein is without merit. Under the law of New York, "the depositor of money in a bank is not in quite so invulnerable a position...." *White v. Bank of Angola,* 130 Misc. 99, 223 N.Y.S. 508, 510 (Sup.Ct. Erie Co.1927). As stated by the Court in *White,* where a defendant bank has "in good faith paid out the money to another than the depositor, [it] may plead and prove, if it can, that it has paid to the true owner." *Id.* 223 N.Y.S. at 512. *See also Bank of Jamestown v. Cattaraugus County Bank,* 148 Misc. 655, 266 N.Y.S. 622, 624 (Sup.Ct. Chautauqua Co.1933) ("The question is not in whose name the money was deposited, but who was the actual owner of the money"); *In re Wilkins' Will,* 131 Misc. 188, 226 N.Y.S. 415, 426 (Surr.Ct. 1928). Defendant Banco de Ponce and third-party defendant the City argue generally that the Bank did remit the disputed funds to the true owner. More specifically, the Bank opposes plaintiff's motion on the ground that (1) Banco de Ponce is a third-party beneficiary of plaintiff's contract with CDA, which required plaintiff to au-

thorize a transfer of funds to CDA upon that agency's written request; (2) the contract between BCC and CDA establishes the City's ownership of the disputed funds at the time of transfer; and (3) plaintiff has produced no documentation to support its alleged ownership of the accounts in question.

Essential to a determination of the dispute now before the Court is a review of the contract entered into between BCC and CDA on October 1, 1972, pursuant to which BCC became the designated conduit for federal and city grant monies (Beckey Aff., Exh. A). The contract is a two-part document. Part I sets forth the specific program grants to be administered under the BCC funding umbrella. Part II recites the general provisions governing all CDA contracts with community corporations. Article II, Part II, entitled "Fiscal Procedures," provides as follows:

"A. *General.* The Contractor shall administer the funds provided by the Agency for the program in accordance with the fiscal procedures set forth in this agreement. The Fiscal Department of the Human Resources Administration ('Fiscal Department') shall perform the fiscal procedures on behalf of the Agency.

"B. *Bank Accounts.*

(1) The Contractor shall establish and maintain a bank account to be used only for the program. The funds in the bank account shall not be commingled with funds from any other source or with funds received under any other agreement.

(2) If funds are deposited in an interest-bearing account, all interest shall be promptly paid to the City when earned.

"C. *Bank Authorization.*

(1) When the bank account is opened, the Contractor shall deliver to the bank an authorization signed by the Contractor stating that:

(i) The bank account is maintained pursuant to an agreement with the Agency.

(ii) The Contractor directs the bank to forthwith comply with any written request made by the Agency or the Fiscal Department to furnish any bank statements, cancelled checks or other information in the possession or control of the bank relating to the bank account.

(iii) The Contractor directs the bank to forthwith comply with any written request made by the Agency or the Fiscal Department to transfer the balance of funds remaining in the account to the Agency.

(2) The Contractor shall deliver to the Fiscal Department a copy of the authorization with the signature of an authorized bank representative indicating that the authorization has been accepted by the bank.

"D. *Notification of Proper Signatories.* The Contractor shall notify the Fiscal Department of the person or persons authorized by the Contractor to receive, handle or disburse moneys under this agreement. Notification must be in writing and furnished to the Fiscal Department within five (5) days from the execution of this agreement and within five (5) days from any subsequent change or substitution."

Although subsection C(1)(iii) clearly requires the community corporation to deliver a signed authorization to the Bank directing it to comply with any written agency request for a transfer of funds from BCC's accounts to CDA, the existence and/or whereabouts of this document is uncertain. BCC's president during 1973, William F. Wilson, avers that he "never executed any such authorization nor has any officer of BCC executed any such authorization. . . ." (Wilson Reply Aff. at 9). Defendant Banco de Ponce states that, although it concededly has been unable to locate the authorization itself, a copy of the pertinent contract provision was found among the Bank's records relating to the transfer of funds from BCC's accounts (Aguilar Aff., ¶ 11), indicating, as the Bank now suggests, that "Both

Banco and CDA assumed BCC had provided the Authorization." (Def. Mem. in Opp. to Pl. Motion at 5). Support for this view is found in a letter of October 25, 1974 from HRA's associate general counsel to the Pitkin Branch manager, stating, in pertinent part, as follows:

"This letter is to authorize and direct your institution to close the above listed accounts and remit the balance of said accounts to the Human Resources Administration, City of New York, in accordance with the authorization filed by the Brownsville Community Corporation with your organization."

Plaintiff contends that defendants' failure to produce the missing authorization mandates summary judgment in its favor, arguing that "the hope that some evidence may turn up at a future time" is not grounds for denial. In sum, plaintiff's argument is predicated on the assumption that, absent production of the document itself, the contract term requiring BCC to authorize compliance with any CDA withdrawal request is irrelevant to the Bank's, or ultimately the City's, liability in the instant action. I cannot agree. Plaintiff's excessively narrow view of the parties' respective obligations with regard to the Banco de Ponce accounts artificially bifurcates BCC's explicit contractual responsibilities to CDA, as set forth in the provision initially authorizing BCC to establish an account for program funds, and the Bank's obligations to BCC as a depositor, the "implied contract" upon which plaintiff now sues. It is clear that the propriety of the Bank's actions in transferring the account funds to the City is a question necessarily subsumed under the ultimately dispositive question of title to the funds, an issue to which I now turn.

In moving for summary judgment against plaintiff, the City argues that the termination of BCC's contract with CDA effectively foreclosed any right to the deposited funds the community corporation may have had. BCC, on the other hand, contends that "Nowhere in the contract does it say that the grant of these funds is conditional and coextensive with the term of the contract between the City and the community corporation." (Wilson Aff. at 5). Plaintiff alleges, in other words, that termination of the 1972 contract does not mandate reversion of the anti-poverty funds to the City, an argument that is disingenuous at best. BCC agreed to its contract with CDA as a prerequisite to receipt of any program funds. As explicitly set forth in Part II, Article II of that contract, a community corporation's fiscal administration is rigorously circumscribed by HRA's ongoing supervisory authority. The City closely monitors expenditures, limits the use of funds allocated to the corporation, and reserves the right to require changes in the scope of services provided by the delegate agencies and to revise the budget accordingly. Furthermore, upon termination of the contract, the community corporation is required to:

"Account for and refund to the Agency, within thirty (30) days, any unexpended funds which have been paid to the Contractor pursuant to this Agreement." Art. VIII, sec. D(1).

The New York State Supreme Court, when called upon to construe a substantially identical contract between the City and another community corporation, found that:

"[T]he only authority which [a community corporation] possesses is that which is delegated by the City agencies, which have the primary responsibility for the anti-poverty programs (see 42 U.S.C. § 2791[c]). This transfer of authority is embodied in a contract between petitioner and respondents....

"The contract, by its terms, was revocable at the option of the City, either for cause, or without cause, upon two weeks' notice to B.C.A. Moreover, the contract specifically provided that the City was under no obligation to continue funding B.C.A.'s programs after the expiration of the term of the contract.

"In view of the foregoing, petitioner has no legal right to the relief sought, namely, a continuation of its status as the local anti-poverty agency for the Bushwick community." *Bushwick Community Association v. New York City Human Resources Administration,* 80 Misc.2d 748, 363 N.Y.S.2d 781, 782–83 (Sup.Ct. Kings Co. 1975).

In the instant action, CDA withdrew recognition of BCC as the designated umbrella corporation for the Brownsville area in August of 1973. Even absent this action on the part of the City, the contract was scheduled to expire by its own terms on September 30, 1973. As noted above, however, BCC alleged that its termination was improperly motivated and, on that basis, was granted a temporary injunction by the New York State Supreme Court pending a determination on the merits. Notably, in granting that injunction, the court explicitly stated that "BCC has not set forth any clear right to a renewal of its contract, the term of which expired September 30, 1973...." *Brownsville Community Council, Inc., supra.* On August 28, 1974, BCC stipulated to a discontinuance of its action and to a vacation of the temporary injunction. Certainly at that point any remaining constraints on CDA's power to terminate the contract lapsed, thereby triggering the agreed-upon close-out procedures and BCC's explicit obligation to "account for a refund to the Agency, within thirty days, any unexpended funds..." (Art. VIII, sec. D(1)). As stated in the affidavit of CDA's Deputy Assistant Commissioner of Fiscal Administration:

"All community action program funds provided under a contract which have not been expended during the period of the contract nor in accordance with the applicable budget belong to the City of New York. This information must be reported to the grantor, the federal Office of Economic Opportunity, or to its successor, the federal Community Services Administration. BCC, Inc., did not comply with the CDA close-out procedures by failing to return said community action funds." (Ivey Aff., ¶¶ 5–6).

Mindful of this Court's obligation under New York law to adjudicate the rights of the parties to a contract "according to the unambiguous terms of the contract" and to "give the words and phrases employed their plain meaning," *Labra v. Carey,* 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641, 644 (1971), I find no support for plaintiff's suggestion that "The word termination does not mean refund" (Wilson Aff. at 5). As recently stated by one court, "It is a basic maxim of contract law that consensual provisions are not to be construed to effect an absurd or totally unreasonable result." *Kenilworth Realty Trust v. Bankers Trust Co.,* 112 Misc.2d 523, 447 N.Y.S.2d 210, 212 (Sup.Ct. New York Co. 1982). To find that plaintiff had title to the deposited funds in January of 1975, at which time BCC was unquestionably in breach of the provision mandating an accounting and return of unexpended funds to the City, would be to ignore the unambiguous terms of the CDA–BCC contract. Accordingly, an essential element of plaintiff's theory of liability—ownership of the funds in question sufficient to ground its alleged debtor-creditor relationship with the Bank—is absent, and plaintiff's motion for summary judgment must fail.

Even were plaintiff able to establish some defect in the City's termination of its contract, it would not be entitled to the relief it now seeks. BCC agreed in its prime contract with CDA to furnish any depository bank with an authorization stating that BCC's bank accounts were "maintained pursuant to an agreement with [CDA]" and further directing the bank to comply with any written requests for account information or a transfer of funds from BCC's account to CDA (Art. II, sec. C(1)(iii)). As noted above, BCC now argues that the Bank's failure to produce this document is determinative of defendant's liability. The City and the Bank, on the other

hand, contend that BCC is estopped from taking advantage of its own avowed breach of a contract provision. In short, defendants argue that if plaintiff had furnished the required authorization, it would now be foreclosed from maintaining the instant action, a view that I find persuasive.

While plaintiff challenges the applicability of an estoppel theory to the situation here, the doctrine is an equitable one and necessarily turns on and is shaped by the circumstances of each case. *Sassower v. Barone,* 85 A.D.2d 81, 447 N.Y.S.2d 966, 971 (2d Dept. 1982); *Travelers Indemnity Co. v. Swanson,* 662 F.2d 1098, 1101 (5th Cir.1981). As stated by the New York Appellate Division, "any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. Where facts cry out for relief the court should do what it can, and equitable estoppel, where appropriate, is then one of its most useful tools." *Sassower, supra,* 447 N.Y.S.2d at 971. The principle of estoppel generally has been invoked by the courts of New York to "prohibit one party upon principles of honesty and fair dealing, from asserting rights, the enforcement of which would, through such party's omission or commission, work fraud and injustice." *Prey v. County of Cattaraugus,* 105 Misc.2d 1091, 430 N.Y.S.2d 916, 921 (Sup.Ct. Cattaraugus Co. 1980). When a party has accepted "the benefits of a transaction, contract, statute, regulation, or order, [it] may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." *Kaneb Services v. Federal Savings and Loan Insur. Corp.,* 650 F.2d 78, 81 (5th Cir.1981). *See Klondike Realty Corp. v. City of New York,* 80 A.D.2d 611, 436 N.Y.S.2d 52, 53–54 (2d Dept.1981) (having had the benefit of the contract, plaintiff is estopped from attacking the agreement).

Plaintiff's contention that the City has failed to demonstrate the requisite elements of promissory estoppel evinces an unduly rigid construction of the doctrine and an attempt to extrapolate from cases with a very different set of circumstances. In *Philo Smith & Co., Inc. v. Uslife Corp.,* 420 F.Supp. 1266 (S.D.N.Y.1976), for example, the sole case on which plaintiff relies, the doctrine of promissory estoppel was asserted to avoid the combined effect of the statute of frauds and the parol evidence rule. Plaintiff in that action sought to demonstrate that, for equitable reasons, defendant should be bound by an oral promise made subsequent to an otherwise binding written agreement. In such a situation, the court properly looked to defendant's fraudulent intent and to whether plaintiff had actually relied on the promise he now sought to enforce, a determination "particularly important in a statute of frauds case where the plaintiff attempts to avoid the unambiguous terms of a written agreement." *Philo Smith, supra,* 420 F.Supp. at 1273.

The circumstances in the instant action are markedly different. Defendant and third-party defendant are not invoking the estoppel doctrine offensively to enforce an oral promise contrary to the terms of a written contract. Rather, their posture is a defensive one. They contend that plaintiff should be estopped from maintaining a suit that, in effect, seeks to take advantage of, and is entirely premised on, plaintiff's conceded breach of an explicit contract term. The authorization requirement, a standard term in every community corporation's contract, insured that the City would maintain ultimate fiscal control over the funds dispersed through the Community Action Program. The City relied upon BCC's compliance with this provision, and manifested its reliance by continuing to disperse federal and municipal monies to BCC pursuant to its reciprocal contractual obligations. As articulated by one New York court, "Equitable estoppel prevents one from denying his own expressed or implied admission which has in good faith been accepted and acted upon by another." *Airco Alloys Division v. Niagara Mohawk Power,* 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (4th Dept.1980). "A party may not, even innocently, mislead an opponent and then claim the benefit of

his deception." *Triple Cities Construction Co. v. Maryland Casualty Co.,* 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856, 858 (1958). Having accepted the considerable benefits of its contract with the Community Development Agency, plaintiff may not now deny a corresponding contractual obligation in order to lay claim to funds otherwise not even arguably its own.

■ One final point remains to be addressed. Plaintiff suggests for the first time in its reply papers that certain of the funds transferred to the City by defendant Banco de Ponce were "granted to BCC pursuant to contracts other than the one allegedly terminated by the City of New York." (Pl. Reply Aff. at 14). As set forth in the supplemental affidavit of CDA's Legal Affairs Director, however, three of the four account categories cited by plaintiff represent programs funded by other agencies in the City's Human Resources Administration, agencies with comparable oversight authority over BCC's fiscal affairs. These agencies are the Manpower Career Development Agency, the Department of Family Planning, and the Youth Services Agency (Chow-Menzer Reply Aff., ¶ 19). The fourth account, entitled "BCC-Mental Health," an account the City indicates might have been a "direct grant" to BCC, had a balance at the time of transfer of only $1.91 (Comp. at 5), an amount insufficient to meet the $10,000 amount in controversy requirement for cases brought pursuant to this Court's diversity jurisdiction.

In any event, although I have not found it necessary to ground my decision in this case on one of the alternative defenses asserted by third-party defendants—the doctrine of laches—I now exercise the Court's discretion to invoke that equitable theory as a bar to any claims purportedly not governed by the terms of the CDA–BCC contract. A determination of laches "depends upon the particular facts and circumstances

of each case and is primarily addressed to the sound discretion of the Court." *Burnett v. New York Central Railroad Co.,* 380 U.S. 424, 435, 85 S.Ct. 1050, 1058, 13 L.Ed.2d 941 (1965). The defense is bottomed on the principle that "equity aids the vigilant, not those who sleep on their rights," *Dalsis v. Hills,* 424 F.Supp. 784, 788 (W.D.N.Y.1976), and is guided by an inquiry into the reasons for plaintiff's delay and the prejudice to defendants thereby generated. *Dickey v. Alcoa Steamship Co.,* 641 F.2d 81, 82 (2d Cir.1981).

In the instant action, although the Bank's alleged breach of an "implied contract" with BCC occurred on January 22, 1975, plaintiff did not commence this action until September 24, 1980, only four months—by plaintiff's calculation[5]—prior to the running of the applicable statute of limitations. Plaintiff has not offered any "substantial excuse for his delay ... sufficient to discharge a plaintiff's burden of demonstrating excuse," *id.,* the pertinent standard as articulated by the Second Circuit, but rather has remained silent on that point and has argued a lack of prejudice to third-party defendant. Contrary to plaintiff's contention, however, the prejudice to the City created by the passage of time appears to be considerable.

Since 1975, the Community Action Program has been entirely restructured pursuant to a federally mandated reorganization that commenced in 1979. *See* 42 U.S.C. § 9901 *et seq.* As set forth in the affidavit of CDA's Director of Legal Affairs, community corporations such as BCC have been eliminated altogether and the functions they formerly performed are now carried out by CDA, area policy boards, and local community-based organizations. Area Policy Board # 16 is responsible for allocating program funds in the Brownsville area, and the "delegate agencies" that once subcontracted with prime contractors like BCC

---

5. The City argues that the six-year statute of limitations began to run on September 30, 1973, the date BCC's contract expired, thus

barring the instant action. I do not find it necessary to address that contention here, nor do I express any view as to its merit.

have been replaced by community-based organizations under contract with, and directly accountable to, CDA (Chow-Menzer Aff., ¶¶ 4–6).

Accordingly, under the present structure, CDA can no longer engage BCC to carry out its former function as an umbrella corporation for the Brownsville area. To obtain funding, BCC would be required to submit specific program proposals to Area Policy Board # 16 and receive the Board's approval. Plaintiff's suggestion that the City has failed to show prejudice because "there is a procedure under which BCC can be funded" misses the point entirely. Should plaintiff prevail in this suit, the City would be required to turn over to BCC in excess of $90,000 in anti-poverty funds to enable BCC to carry out its avowed purpose of continuing "its service to the community in the many worthy projects undertaken by plaintiff." (Wilson Aff., ¶ 4). The City would, in effect, be required to fund a "renegade" agency operating independent of the Area Policy Board and potentially in conflict with local community-based organizations that have received Board # 16 approval. The current funding structure and administration has no provision for an organization like BCC that wishes to allocate its budget among various delegate agencies while retaining programmatic control. The disruption to the Community Action Program brought about by plaintiff's lengthy delay in instituting this suit would clearly be considerable, and I therefore find the doctrine of laches applicable to claims allegedly outside the scope of the 1972 contract.

For the above reasons, plaintiff's motion for summary judgment is denied and third-party defendant's motion for summary judgment dismissing the complaint is granted. The Clerk of the Court is directed to dismiss the complaint with prejudice and without costs.

It is So Ordered.