UNITED STATES of America, Plaintiff,

v.

Joseph E. KRIEGER and Sally Krieger, Defendants.

No. 86 Civ. 2120 (RLC).

United States District Court, S.D. New York.

July 24, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for the U.S. (Peter C. Sprung, Asst. U.S. Atty., of counsel).

Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, N.J., for defendants (J. Barry Cocoziello, of counsel).

ROBERT L. CARTER, District Judge.

In 1978, Tarra Hall Clothiers, Inc. ("Tarra Hall"), a New York-incorporated garment manufacturer, received two direct loans totalling $1 million from the Economic Development Administration ("EDA"), an agency within the United States Department of Commerce, under an economic assistance program established by the Trade Act of 1974, 19 U.S.C.A. §§ 2101 *et seq.* (West 1980 & Supp.1991) (the "Trade Act"). It is undisputed that defendant Joseph E. Krieger, president and 100% shareholder of Tarra Hall, executed two notes evidencing these loans, and that he and his wife, defendant Sally Krieger, executed personal guarantees of the total amounts due under the notes. The undisputed facts also show that in 1980, Tarra Hall defaulted on both notes, and that in 1982, the EDA exercised its option to accelerate the maturity dates of the two notes, made written demands upon Tarra Hall for the outstanding principal amounts plus accrued interest, and demanded payment from the Kriegers pursuant to the personal guarantees. The EDA thereafter referred the matter to the United States Department of Justice for litigation, and in March, 1986, the United States Attorney for the Southern District of New York commenced the instant action pursuant to 28 U.S.C. § 1345 to enforce the guarantees against the Kriegers.

Joseph Krieger counterclaimed against the United States for breach of contract, alleging that, when the EDA agreed to provide the two direct loans to Tarra Hall, the EDA also agreed to provide a 90% guarantee of another loan for Tarra Hall from a commercial lender. Joseph Krieger claimed that Tarra Hall accepted the two direct loans and that he and his wife signed the personal guarantees for these direct loans in reliance on the EDA's alleged agreement to provide the guarantee on the commercial loan. He further alleged that the EDA later breached this agreement, and that its breach resulted in damages to both Tarra Hall and himself.

The United States now moves for summary judgment on its claim against the Kriegers pursuant to Rule 56, F.R.Civ.P., and for dismissal of Joseph Krieger's counterclaim pursuant to Rule 12(b)(1), F.R.Civ. P., for lack of subject matter jurisdiction. The Kriegers cross-move for summary judgment on the United States' claim, and, in the alternative, seek a court order enforcing a proposed settlement agreed upon by the parties in April, 1987.

## I. MOTIONS FOR SUMMARY JUDGMENT

### A. *Background*

Central to each side's summary judgment motion is the threshold issue of whether the personal guarantees upon which the Kriegers are presently being sued are enforceable. The Kriegers contend that the EDA obtained the personal guarantees from them for collateral purposes, and that the EDA thereby violated its own regulation specifically authorizing resort to personal guarantees "only when necessary to assure continued interest and effort of the borrower's owners or management on behalf of the borrower." 13 C.F.R. § 315.62(a)(1)(i) (1977) [hereinafter the "EDA regulation"]. They assert that the personal guarantees are therefore illegal contracts, are contrary to public policy, and cannot be enforced against them.

Alternatively, the Kriegers argue that the EDA's "extraction" of personal guarantees from them without making a preliminary finding that such guarantees were "necessary" within the meaning of the EDA regulation, constituted agency action that was both "in excess of statutory authority" and "arbitrary and capricious." They assert that the guarantees must therefore be set aside pursuant to the Administrative Procedure Act. 5 U.S.C.A. § 551 *et seq.* (West 1977 & Supp.1991).

Finally, Sally Krieger contends that even if the personal guarantees may have been obtained from her husband in accordance with the EDA regulation's mandate that such guarantees be required only when necessary to assure management's continued interest and effort, and may therefore be enforceable against him, the guarantees from her could not possibly have been authorized under the regulation's mandate since she was neither an officer nor a shareholder of Tarra Hall. Therefore, she asserts, the guarantees cannot be enforceable against her.

As an initial matter, the court notes that the Kriegers failed to plead the affirmative defenses of illegality and invalidity of the personal guarantees in their answer to the United States' complaint, *see* Rule 8(c), F.R.Civ.P., and that, in the five years that have passed since the filing of the complaint, ·the Kriegers also failed to seek to amend their answer, *see* Rule 15(a), F.R.Civ.P., so as to include these affirmative defenses in the pleadings. These procedural defects raise two difficulties for the court.

First, due to the mandatory language of Rule 8(c), F.R.Civ.P., failure to plead an affirmative defense such as illegality generally results in waiver of that defense and its exclusion from the case. *United States ex rel. Maritime Admin. v. Continental Illinois Nat. Bank & Trust Co.,* 889 F.2d 1248, 1253 (2d Cir.1989); *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984). Second, technically speaking, the Kriegers' failure to plead the affirmative defenses of illegality and invalidity constitutes failure to "place in issue" the validity of the personal guarantees. This has serious ramifications for the legal stan-

dards to be applied in the parties' cross-motions for summary judgment, since, generally, "[a]n obligee as plaintiff in an action against a guarantor has the burden of proof of all the essential elements of the cause of action which he has alleged, including the execution and existence of the contract on which he sues, [and] that it is supported by consideration...." 63 N.Y.Jur.2d § 372 at 492 (1987 & Supp. 1990).¹ Only where the validity of the guarantee contract has been placed in issue is the contract's validity also an essential element to be proved by the plaintiff obligee. *Id.; cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (summary judgment is mandated where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial).

■ Nevertheless, under both federal and New York law, it is not absolutely necessary to plead the illegality of a contract which is also contrary to public policy. *See, e.g., Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 77, 102 S.Ct. 851, 856, 70 L.Ed.2d 833 (1982), *quoting McMullen v. Hoffman,* 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1899) ("no court will lend its assistance in any way towards carrying out the terms of an illegal contract"); *Attridge v. Pembroke,* 235 A.D. 101, 256 N.Y.S. 257 (1932); *Metz v. Woodward–Brown Realty Co.,* 182 A.D. 60, 169 N.Y.S. 299 (1918). In other words, the court may, *sua sponte,* "step in and deny the right to any relief [under an agreement] without reference to the state of the pleadings, whenever it becomes apparent that the agreement is antagonistic to the interests of the public." 21 N.Y.Jur.2d § 142 at 548–49 (Lawyers' Co-op 1982 & Supp.1991). In their summary judgment motion, the Kriegers have raised the claim that the personal guarantee contracts are contrary to public policy.

■ In addition, even under circumstances not involving defenses based on public policy, courts have held that failure to plead the affirmative defense of illegality does not necessarily compel a judicial determination of waiver where the failure did not prejudice the plaintiff. *See, e.g., Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 855 (5th Cir.1983); *Steinberg v. Columbia Pictures Indus., Inc.,* 663 F.Supp. 706, 715 (S.D.N.Y.1987) (Stanton, J.). In this case, the United States appears not to have been prejudiced by the Kriegers' failure to plead their defenses of illegality and invalidity. It has had an adequate opportunity to respond to these challenges. *See Allied Chem. Corp., supra,* 695 F.2d at 856; *cf. Continental Illinois Nat. Bank and Trust Co., supra,* 889 F.2d at 1253 (defendant should have been permitted to amend pleading to assert additional defense, where question of whether defense had to be specifically pleaded was fairly close one, and plaintiff had already been alerted to defense by pleading of codefendant). What is more, nowhere in its opposition to the Kriegers' summary judgment motion does the United States even mention, let alone object to, the Kriegers' failure to plead these defenses. *See, e.g., Canal Ins. Co. v. Earnshaw,* 629 F.Supp. 114, 119 (D.Kan.1985).

For these reasons, and in the interest of avoiding further delay in the adjudication

---

1. Federal law governs questions involving the rights of the United States arising under nationwide federal programs. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *United States v. Meadors,* 753 F.2d 590, 592 (7th Cir.1985). Moreover, the rights and duties of the United States regarding commercial paper that it issues are governed by federal rather than local law. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943). However, "[i]n the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards.... In our choice of the applicable federal rule we have occasionally selected state law." *Id.* at 367, 63 S.Ct. at 575. *See United States v. New Mexico Landscaping, Inc.,* 785 F.2d 843, 845 (10th Cir.1986). Since there is no substantive body of federal law on the essential elements and burdens of proof in a claim arising out of a guarantee contract, the court looks to the law of New York, the situs of the execution of the Kriegers' personal guarantees, of the closings on Tarra Hall's Trade Act loans, and of the personal and real property that may be subject to judgment, if the government were to prevail on its claim.

of this case, the court has chosen to excuse the Kriegers' failure to raise illegality and invalidity in the pleadings, to deem the validity of the guarantee contracts as having been "placed in issue," and to consider the Kriegers' claims of illegality and invalidity on the merits.

### B. *Statutory Procedures and Regulations Under the Trade Act*

In response to increased import competition, Congress enacted the Trade Act in order to, *inter alia,* "assist industries, firms, workers, and communities to adjust to changes in international trade flows...." 19 U.S.C.A. § 2102(1)(4). As part of the Trade Act, Congress established the "Adjustment Assistance to Firms" program ("loan program") to provide technical and financial assistance to United States firms in their efforts to make such economic adjustments. *Id.* §§ 2341 *et seq.* Since it was under this loan program that the EDA provided its two direct loans to Tarra Hall, the court looks first to the statutory provisions pertaining to this program in considering the Kriegers' claims of illegality and invalidity.

These statutory provisions delineate the various administrative procedures to be followed and standards to be applied by the Secretary of Commerce (the "Secretary") in determining first whether a firm is eligible for assistance under the loan program, *id.* § 2341, and then whether to approve an eligible firm's application for assistance. *Id.* § 2342. The statute authorizes the Secretary to provide, *"on such terms and conditions as he determines to be appropriate,* such financial assistance in the form of direct loans or guarantees of loans as *in his judgment* will materially contribute to the economic adjustment of the firm," *id.* § 2344(a) (emphasis added), but "only for the purpose of making funds available to the firm (1) for acquisition, construction, installation, modernization, development, conversion, or expansion of land, plant, buildings, equipment, facilities or machinery, or (2) to supply such working capital as may be necessary to enable the firm to implement its adjustment proposal." *Id.* § 2344(b).

In addition, the statute requires that such loans be provided only after the Secretary has determined (1) that the funds required are not available from the firm's own resources; and (2) that there is reasonable assurance of repayment of the loan. *Id.* § 2345. The statute itself, however, makes no mention of any administrative procedures and standards for determining whether to require personal guarantees as part of the loan approval process.

■ The only provision specifically addressing personal guarantees is found in the above-mentioned regulation promulgated in 1977 by the EDA, the division in the Department of Commerce that was responsible for administering the loan program. This EDA regulation grew out of objections to the EDA's prior routine practice of seeking personal guarantees from managers as collateral for their firms' Trade Act loans. *See* Transcript of Deposition of Harold W. Williams, former Deputy Assistant Secretary of the EDA, Sept. 10, 1990 [hereinafter "Williams Dep."], at 36–37, 42. Following the regulation's effective date of November 22, 1977, the EDA's policy was to ask for personal guarantees only "when and if [the EDA had] reason to believe that [they were] needed to keep the people in charge of the company active in the management of the company and having a financial stake in staying with the company and seeing to it that the company made a real and continued effort to turn the company around." *Id.* at 47. Where, as here, Congress has delegated to an administrative agency the power to give meaning to statutory provisions or to promulgate standards, regulations adopted by the administrative agency in the exercise of that delegated authority have the force of law, *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *AFL–CIO v. Donovan,* 757 F.2d 330, 341 (D.C.Cir.1985), and the agency is therefore bound by its own regulations. *Bahramizadeh v. I.N.S.,* 717 F.2d 1170, 1173 (7th Cir.1983).

Moreover, ignorance of a regulation adopted by an agency pursuant to its con-

gressionally delegated authority is immaterial. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947). Thus, both the government and the private recipient of governmental assistance are bound by a restriction such as that contained in the EDA regulation. *See, e.g., id.; Augusta Aviation, Inc. v. United States*, 671 F.2d 445, 449 (11th Cir.1982). In any case, according to Edward J. Morris, former chief of the EDA's Business Development Division in Philadelphia, which processed Tarra Hall's loan application, the EDA policy change pursuant to the newly promulgated regulation was communicated in December, 1977, to the EDA financial analysts in charge of initially reviewing applications for financial assistance under the loan program. *See* Transcript of Deposition of Edward J. Morris, Oct. 24, 1990, at 33–35; Appendix in Support of Defendants' Notice of Motion for Summary Judgment [hereinafter "App."], Exhibit A (Memorandum of Edward Morris, dated Dec. 5, 1977). Therefore, knowledge of the EDA regulation and its mandate can be easily imputed at least to those financial analysts who worked in the EDA's Philadelphia office.

Richard L. Sullivan, who worked at the EDA's Philadelphia office from January to June, 1978, was the project officer and financial analyst of the EDA's Trade Adjustment Assistance Unit ("TAAU") who reviewed Tarra Hall's loan application. *See* Transcript of Deposition of Richard L. Sullivan, Aug. 27, 1986 [hereinafter "Sullivan Dep."], at 21–22, 64, 131. In that capacity, Sullivan prepared an "action memorandum" dated March 22, 1978, *see* App., Exhibit D, analyzing Tarra Hall's loan application and recommending that it be approved. The action memorandum states in its "Repayment Analysis" section, under the heading "Collateral":

> The two EDA loans, totalling $1,000,-000[,] will be secured on a pari-passu basis by the following:
>
> 1) First security interest in new security and equipment.
> 2) Subordinate security interest in Accounts Receivable which had a net book value of $420,504 in [f]iscal year ending November 30, 1977, subject to the prior security interest of Bankers Trust Company.
> 3) Subordinate [s]ecurity interest in all of existing furniture, fixture, machinery, equipment (including automobiles) which had a net book value of $212,409 as of fiscal year ended November 30, 1977.
> 4) *Personal Guaranty of Joseph Krieger and wife* who had a net worth of $696,000 as of March 1, 1978.
>
> EDA's collateral position is typically weak for these Trade Act loans. However, TAAU has concluded that all available security is being taken for these loans.
>
> Based on the foregoing factors, substantiated by information contained in the file, TAAU has concluded that there is reasonable assurance of repayment of the loans.

App., Exhibit D, at 9 (emphasis added).

Other than in the above-excerpted portion, the action memorandum contains no mention of the Kriegers' personal guarantees of the EDA loans. It does note, however, that Joseph Krieger had already personally guaranteed non-Trade Act loans for equipment and for accounts receivable financing, and had personally loaned Tarra Hall $245,000.00, *see id.* at 4, which suggests that Joseph Krieger's continued interest and effort in the management of Tarra Hall was already assured, obviating the need for any personal guarantees of the two loans under the Trade Act. The action memorandum also contains in its "Repayment Analysis" section the conclusion that, based upon the manufacturing and marketing ability of Tarra Hall's management, including Joseph Krieger's extensive experience in the garment trade, Tarra Hall "will be efficiently administered, operated and maintained." *Id.* at 5.

Relying heavily on this document and on Sullivan's deposition testimony, the Kriegers contend that they are entitled to summary judgment on the United States' claim. As they correctly point out, Sullivan testified that, as a matter of routine course and

practice, he sought personal guarantees of the applicant firms, their presidents or other individuals, in addition to other collateral, when he processed Trade Act loans. Sullivan Dep. at 115. He also testified that, before approving a Trade Act loan application, he had to be satisfied that the loan was fully secured by collateral, *id.* at 119, and that, without the Kriegers' personal guarantees, there would have been insufficient collateral for Tarra Hall's two loans under the Trade Act. *Id.* at 114.

The Kriegers argue that the only factual conclusions that can be reached from this testimony, the inclusion of the Kriegers' personal guarantees under the "Collateral" heading of Sullivan's action memorandum, and the action memorandum's observation that Joseph Krieger had already committed himself personally and financially to the economic turnaround of Tarra Hall, are that Sullivan completely failed to make the requisite finding that the Kriegers' personal guarantees were necessary within the meaning of the EDA regulation, and further, that he required the personal guarantees instead for collateral purposes, which the EDA regulation had specifically prohibited.

■ It is true that a factfinder may reasonably infer from Sullivan's deposition testimony and from the contents of his action memorandum that the EDA wrongfully obtained the personal guarantees from the Kriegers. However, the court cannot at this stage of the litigation conclude that this is the only reasonable inference that may be drawn. *See Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979) (citations omitted) ("even though there may be no dispute about the basic facts, still summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those facts"). This is so particularly in light of the affidavit from Sullivan that the government has submitted in opposition to the Kriegers' summary judgment motion. *See* Plaintiff's Opposition to Defendants' Statement Pursuant to Rule 3(g), Affidavit of Richard L. Sullivan [hereinafter "Sullivan Aff."]. In his affidavit,

Sullivan states that, prior to his processing of Tarra Hall's loan application, he attended a meeting with Joseph Krieger and his two sons at the Department of Commerce's offices, during which Joseph Krieger described Tarra Hall's garment business, noted his own considerable sales and marketing experience and extensive contacts in the garment industry, and made apparent that Tarra Hall was a small, family-owned business. *Id.* at 7.

Sullivan further states that although he does not presently recall the reasons why he informed Joseph Krieger that the EDA would require personal guarantees from him and his wife, he does recall "concluding that keeping Joseph Krieger involved in the management of Tarra Hall would be important to successful implementation of the company's adjustment plan and to ensuring that any loan would be repaid out of the company's sales." *Id.* at 8. Sullivan explains that he had reviewed many Trade Act loan applications similar to that of Tarra Hall, that he had observed that "these companies survived on the strength of a single manager who ... [had] developed a thorough knowledge of the business, broad contacts, and a great deal of sales and marketing expertise," *id.,* and that, as a general matter, he considered the continued interest of key management in companies such as Tarra Hall to be "essential to their financial recovery and to ensuring repayment of the government's loan from the firm's sales." *Id.* Sullivan states that his experience had shown that firms like Tarra Hall would frequently go into and out of business and often had burdensome debts, "to which their managers often sought to apply the [Trade Act] loan proceeds instead of using the money as prescribed by the adjustment plans [that the firms had submitted to the EDA as part of their loan applications]." *Id.* at 8–9.

Supplementing his deposition testimony concerning his routine practice of requiring personal guarantees for Trade Act loans, Sullivan explains in his affidavit that this practice applied to Trade Act loans for small, family-owned businesses which, like Tarra Hall, were largely dependent upon the participation of a single manager.

"The rationale of this practice was ... to induce key management to remain interested in the firm, thereby maximizing the likelihood that the [firm's] adjustment plan would successfully be implemented and that the loan would be repaid from the company's operations." *Id.* at 11. This explanation supports the government's position that Sullivan, acting as the EDA's representative, obtained the personal guarantees from the Kriegers for a purpose specifically authorized under the EDA regulation.

Furthermore, Sullivan states in his affidavit that, although he does not presently recall why he required Sally Krieger's signature on the personal guarantees, he had generally believed that "a manager's guaranty was not worth much if his wife was also not bound; often the manager's principal personal assets were held jointly with his wife, and a hard-pressed manager could avoid his obligation under the guaranty simply by transferring his assets to his wife." *Id.* at 9. Sullivan explains that he often required a manager's wife also to sign the personal guarantees as a way of ensuring that the manager's guarantee was a "meaningful inducement to his continued participation in the company." *Id.*

■ When a party moves for summary judgment primarily on the basis of a deposition of the nonmoving party that contains factual information that would entitle the movant to judgment, but the nonmoving party then introduces a later-made affidavit contradicting the deposition testimony, credibility issues may arise and preclude summary judgment. Thus, summary judgment may not be granted where a later filed affidavit creates "a genuine issue of material fact" by supplying additional information, particularly where the deponent's answers had not been clear or the questions posed to him had not been altogether unambiguous. *See, e.g., Villante v. Dept. of Corrections,* 786 F.2d 516, 522 (2d Cir.1986); *Tippens v. Celotex Corp.,* 805 F.2d 949, 954 (11th Cir.1986); *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104 (7th Cir.1985); *Bender v. Southland Corp.,* 749 F.2d 1205, 1211 (6th Cir.1984).

Upon review of the entire transcript of Sullivan's deposition testimony together with the additional information provided by Sullivan's affidavit, it is clear to the court that there remain genuine issues of material fact as to the critical question of whether the EDA sought and obtained the Kriegers' personal guarantees for an unauthorized and therefore illegal purpose. For this reason, whether the issue of the guarantee contracts' validity is considered in terms of illegality of contract or in terms of noncompliance with administrative procedure,[2] neither the Kriegers nor the government is entitled to summary judgment on the United States' claim. *See Celotex, supra,* 477 U.S. at 322, 106 S.Ct. at 2552.

This conclusion is not altered by the government's contention that, even if the EDA had violated its own regulation in obtaining the personal guarantees from the Kriegers, the doctrine of equitable estoppel entitles the United States to summary judgment on its claim. According to the government, the Kriegers undertook to

---

2. Section 706 of the Administrative Procedure Act provides: "The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] in excess of statutory ... authority ... [or] without observance of procedure required by law." 5 U.S.C.A. § 706(2)(A), (C), (D). Thus, while a reviewing court should generally defer to the action taken by the agency, which is presumed to be valid, *Sierra Club v. U.S. Army Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir.1985), *citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), it must nonetheless set aside agency action as ar-

bitrary and capricious where it is clear that the agency relied "on factors Congress did not want considered, or utterly fail[ed] to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation ... is so implausible that it cannot be ascribed to differing views or agency expertise." *Sierra Club, supra,* 772 F.2d at 1051, *quoting Colorado Interstate Gas Co. v. Fed. Power Comm'n,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). On the basis of what is now before the court, none of these circumstances for invalidating the EDA's personal guarantee contracts has been convincingly established by the Kriegers nor refuted by the government.

guarantee the two loans under the Trade Act, willingly accepted the benefits of those transactions, and therefore should be estopped from now challenging the EDA's actions in processing and approving those loans. Citing, *inter alia, Federal Power Comm'n v. Colorado Interstate Gas Co.,* 348 U.S. 492, 501–02, 75 S.Ct. 467, 472–73, 99 L.Ed. 583 (1955), *Kaneb Services, Inc. v. Fed. Sav. & Loan Ins. Corp.,* 650 F.2d 78, 81–82 (5th Cir.1981), and *Brownsville Community Council v. Banco de Ponce,* 567 F.Supp. 849, 857–58 (S.D.N.Y.1983) (Haight, J.), the government asserts that a private party's acceptance of the benefits of an administrative order or ruling precludes that party from later attacking the conditions of such order or ruling.

The government has pointed to several cases that contain language favorable to its estoppel argument, but these cases do not persuade the court that invocation of the equitable estoppel doctrine is appropriate at the present time. It is noteworthy that *Federal Power Comm'n,* upon which the government principally relies, involved primarily the power of a reviewing court to consider challenges to administrative action *sua sponte,* and addressed a regulatory order rather than a contract. *See* 348 U.S. at 498–501, 75 S.Ct. at 471–473. Moreover, in the other cases cited by the government, no challenged governmental action was involved, *see United States v. Consol. Edison Co.,* 452 F.Supp. 638, 653 (S.D.N.Y.1977) (Pierce, J.), *aff'd as modified,* 580 F.2d 1122 (2d Cir.1978), the challenged governmental action was determined to have been authorized, *see Kaneb Services, supra,* 650 F.2d at 82, or the estoppel argument had been invoked defensively, *see Brownsville Community Council, supra,* 567 F.Supp. at 857, all of which are distinguishable from the instant case. Most important, the government has not shown that the "facts cry out for relief," *id.,* as to warrant application of equitable estoppel in its favor.

## II. MOTION TO ENFORCE PROPOSED SETTLEMENT

■ The court now turns to the Kriegers' alternative motion for enforcement of

a proposed settlement agreed upon by the parties. Starting in the fall of 1986, the parties engaged in fairly extensive settlement negotiations, having mutually requested and been granted an order of discontinuance from the court. *See* Affidavit of J. Barry Cocoziello, January 21, 1991, at 1. On April 16, 1987, a settlement conference was attended by Joseph Krieger; J. Barry Cocoziello, the Kriegers' attorney; Herb Lenchner, senior financial analyst of the EDA's Liquidation Division; and William E. Simon, Jr., then the Assistant United States Attorney in charge of this case. The various terms of a proposed settlement were ironed out, but the proposed settlement was later rejected by the Commerce Department. Accordingly, Simon never submitted the proposed settlement to the Assistant Attorney General in charge of the Civil Division for his approval, and no settlement offer was ever so approved. Declaration of William E. Simon, Jr., February 19, 1991, at 3.

Cocoziello, Lenchner and Simon have submitted affidavits with conflicting accounts of Lenchner's and Simon's representations during the April 16, 1987 settlement conference concerning their authority to accept a settlement proposal. Regardless of what representations were actually made by Lenchner or Simon during the April 16, 1987, settlement conference, the Justice Department never authorized the proposed settlement pursuant to regulations that have, since October, 1981, governed the settlement of civil claims on behalf of the United States. *See* 28 C.F.R. §§ 0.161 *et seq.* (1989). Therefore, the United States cannot be bound by the proposed settlement, *see, e.g., Merrill, supra,* 332 U.S. at 384, 68 S.Ct. at 3; *New America Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir.1989); *Doe v. Civiletti,* 635 F.2d 88, 96 (2d Cir.1980), and the Kriegers' motion to enforce its terms is denied.

## III. MOTION TO DISMISS JOSEPH KRIEGER'S COUNTERCLAIM

The United States moves to dismiss Joseph Krieger's counterclaim pursuant to

Rule 12(b)(1), F.R.Civ.P., for lack of subject matter jurisdiction, and for summary judgment on the counterclaim pursuant to Rule 56, F.R.Civ.P. With respect to its Rule 12(b)(1) motion, the government notes that, in interposing his counterclaim, Joseph Krieger failed to allege any basis for this court's assertion of subject matter jurisdiction. The government asserts that the counterclaim should be dismissed for this deficiency alone, and the court agrees.

Under Rule 8(a)(1), F.R.Civ.P., "[a] pleading which sets forth a claim for relief, whether an original claim [or a] counterclaim ..., shall contain ... a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it...." Joseph Krieger argues that he did not need to allege the jurisdictional basis for his counterclaim since it stems from the same subject matter as that of the government's cause of action against the Kriegers and is therefore a compulsory counterclaim under Rule 13(a), F.R.Civ.P.

■ However, it is elementary that the United States, as sovereign, enjoys immunity from suit except where it has expressly consented to being sued. *See, e.g., Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 2475, 110 L.Ed.2d 387 (1990); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). The general rule that jurisdiction for a compulsory counterclaim need not be pleaded does not apply when the sovereign immunity of the United States is implicated. *Cf.* Rule 13(c), F.R.Civ.P. Thus, any counterclaim in an action brought by the United States must show the authority by which the claim against the United States may be maintained in order for the court to be able to exercise its jurisdiction. *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940); *cf. M & M Transp. Co. v. U.S. Industries, Inc.,* 416 F.Supp. 865, 868 (S.D.N.Y.1976) (Conner, J.).

The government's motion to dismiss Joseph Krieger's counterclaim on Rule 12(b)(1) grounds is granted. The court therefore does not reach the government's motion for summary judgment on the counterclaim.

IV. CONCLUSION

In sum, the parties' cross-motions for summary judgment on the United States' claim are denied. The Kriegers' motion for enforcement of the proposed settlement of April 16, 1987, is also denied. The United States' motion to dismiss Joseph Krieger's counterclaim pursuant to Rule 12(b)(1), F.R.Civ.P., is granted. However, pursuant to Rule 15(a), F.R.Civ.P., Joseph Krieger may move to amend his pleading on or before August 9, 1991. If he does so, the parties are instructed to fully substantiate their respective positions on the issue of this court's power to assert subject matter jurisdiction over the counterclaim, giving particular attention to the Tucker Act, 28 U.S.C.A. § 1346(a)(2), the "sue and be sued" section of the Trade Act, 19 U.S.C.A. § 2350, and the Second Circuit precedents on the doctrine of sovereign immunity as applied to counterclaims against the United States.

IT IS SO ORDERED.